# MAYOR & CITY COUNCIL OF BALTIMORE.

## *vs.*

## M. A. TALBOTT & COMPANY.

*Contracts: construction; Baltimore City sewers; approval of engineer; charges and deductions against the contractors.   Prayers: assuming facts.*

In a contract for building the sewers of Baltimore City, in regard to certain portions of the work, there was the provision that "the plastering will not be paid for separately, but it is to be included in and covered by the price paid for the masonry"; the engineer for the city held this to mean, that the price bid for the masonry, there referred to, included the charge for the plastering, and did not mean that the plastering was to be measured and paid for at the same rate as the masonry.                                      p. 359

By the same contract it was provided that the engineer should be a referee, and that he should in all cases determine the amount, quality and acceptability of the work to be paid for; that in case of any question arising between the parties touching the contract, his estimate and decision should be a condition precedent to the right of the contractor to recover any monies under the contract; *held,* that, under this provision, the engineer had power to determine whether in such a case the pay should include the masonry only, or the masonry and the plastering.                                      p. 360

Under the provisions in the contract, relating to the removal of certain obstructions which should be found to follow the line

or occupy the place of the excavation, etc., it was *held,* that a 20-inch water main intersected by a high-pressure pipe of that diameter, in the sewer excavation, was to have been taken care of by the Sewerage Commission, and not by the contractor.                                   p. 367

Prayers that assume as proved facts of which there is no evidence are erroneous.                                   p. 367

In a suit by the contractor for a balance due for work on the sewer, a prayer of the plaintiff to instruct the jury that he was entitled to money paid out on account of extra cost of the work incurred, because of the failure of the city to remove certain obstructions, high-pressure water mains, etc., in the line of the excavation, was *held* to be erroneous, because it assumed that there was such extra cost.      p. 367

A provision in which a contract authorizes the engineer for the city to have certain repairs made by the city department, and deduct the cost from any amount due or that might become due the contractor, does not authorize the repairs to be made at any price that the department doing the work may see fit to charge, without any right on the part of the contractor to dispute it.                           p. 369

In making such charges, the city is not entitled to charge for repairs or renewal of water mains, etc., made necessary by their bad condition, and not because of any act of the plaintiff.                                   p. 370

Whenever such contracts do the contractors injustice they should be liberally construed in their favor.      p. 369

*Decided April 10th, 1913.*

Appeal from the Superior Court of Baltimore City (AMBLER, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Alexander Preston* and *S. S. Field* (with whom was *Edward J. Colgan, Jr.,* on the brief), for the appellant.

*Robert D. Bartlett* and *J. Kemp Bartlett* (with whom were *L. B. Keene Claggett* and *R. Howard Bland* on the brief), for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The appellees sued the appellant upon seven contracts made between them for the constructon of sewers in the City of Baltimore, and all errors in pleading were waived. The contracts sued on required the performance of work and the furnishing of materials of a total value of over a million dollars, but the appellees had been paid the most of the contract prices, and they only recovered a verdict for $15,183.88, which was a little less than three-fourths of the claims made by them. There are three bills of exception in the record— the first two presenting rulings as to the admissibility of evidence, and the third embracing the rulings on the prayers.

*First*—We will consider the first bill of exceptions and the first prayer of the plaintiff together, as they involve the construction of the contract and the question of how far the decision of the engineer as to the payment of the plastering on the extrados of the arches of the sewers and on the manholes was conclusive. It was agreed by counsel that the provisions set out in the record "are the same as those contained in the other six contracts involved in this case," and hence in discussing the case we speak of the contract, in the singular, although there were really seven.

The contract signed by the parties recites that whereas the contract for building Section Two of the Outfall Sewer in

certain streets in the City of Baltimore, as shown on plans on file in the office of the Chief Engineer of the Sewerage Commission, "subject to all conditions, covenants, stipulations, terms and provisions contained in certain specifications, a copy of which is hereto attached, and in all respects made a part hereof, has recently been awarded to the contractor by the city," etc., and whereas, one of the conditions of the said award was that a formal contract should be executed, "Now, Therefore, This Contract Witnesseth, That the contractor doth hereby covenant and agree with the city that they will well and faithfully build said drain in accordance with each and every one of the conditions, covenants, stipulations, terms and provisions contained in said specifications * * *, and will well and faithfully comply with and perform each and every obligation imposed upon them by said specifications, or the terms of said award." The city then covenants to pay to the contractor "when due and payable under the terms of said specifications and of said award," the sum named, "and that it will well and faithfully comply with and perform each and every obligation imposed upon it by said specifications or the terms of said award."

The following provisions in the specifications are a part of the contract: Section 109. "Except when the engineer shall direct otherwise, the arch of the sewer shall be of 'Class A' concrete masonry, laid as elsewhere herein specified. Whenever it is advisable, in the opinion of the engineer, the arch of the sewer shall be built of reinforced concrete or brick masonry, of the qualities herein described. The extrados of the arch, of whatever material, shall be neatly plastered with cement mortar one-half (½) inch thick over its entire surface extending down to the springing-line on each side, the surface of the arch being thoroughly cleaned and wetted before-hand. This mortar shall consist of one (1) part cement, one-half (½) part lime paste, and four (4) parts clean, sharp sand. The plastering required over the extrados of the arch is to be carried forward as the masonry is laid, and immediately after the arch is completed."

"Section 124. Payment. Brick and concrete masonry will be paid for by the cubic yard for the net volume of masonry per linear foot required by the dimensions given on the plans. The length of the sewer will be determined by horizontal measurements, and deductions will be made for masonry omitted at all manholes and openings. *Plastering on extrados of arch will not be paid for separately, but it is to be included in and covered by the price paid for masonry.*"

Section 127. "The outside of all manholes shall be neatly plastered with cement mortar one-half (½) inch thick, to such point as the engineer may direct. *This plastering will not be paid for separately, but it is to be included in and covered by the price paid for the masonry.*"

It will be observed that the same provision is made as to the payment for the plastering on the extrados of the arches as for that on the outside of the manholes. The appellant and the appellees differ in their construction of the terms italicized. The appellant contends that by those terms the compensation of the contractors for the plastering was included in the price paid for the masonry; that they were to receive so much per cubic yard for the masonry, and in making their bid for it were supposed to include the compensation for the plastering, which they were required to do. The appellees on the other hand contend that by the proper construction of the contract they were to be paid for the plastering as if it was masonry, and that hence the measurements of the masonry should have included the half-inch called plastering. The Court below adopted the contention of the appellees both as to the construction of the contract and of the right of the Court to construe it, and hence refused to allow the question asked the engineer, which was intended to show that he had decided that the measurement of the plastering could not be included with that of the masonry, and that no allowance could be made for it other than what was included in the payment for the masonry, and the Court also by the first prayer in effect instructed the jury to find for the appellees

for the amount of plastering at the price fixed for the masonry.

It is manifest that something may be said on both sides as to the proper construction of the contract. If in point of fact the appellees in their bid did not take into consideration the fact that they were required to plaster the extrados of the arches and the outside of the manholes, and did not understand that they were to include that in their bid for the masonry, then the city would virtually have that plastering done for nothing; but, on the other hand, if the estimate of the cost of the plastering was to be included in the bid for the masonry, then if it can be measured as if it was a part of the masonry, the city would have to pay twice for it. If the appellees' theory be correct, a more simple way would have been to say: "Plastering on extrados of arch will not be paid for separately, but it is to be measured with the masonry and to be paid for at the price paid for masonry." The appellees contend that it means that the plastering "is to be included in the masonry and covered by the price paid for the masonry," but the appellant replies that it does not say the plastering is to be included in the measurement of the masonry, but that the *payment* for the plastering "is to be included in and covered by the *price* paid for the *masonry*"— that is to say, *included in the price and covered by the price* paid for the masonry. The bid of the plaintiffs was "For all ordinary concrete masonry 'Class A,' the sum of nine and fifty one-hundreds dollars ($9.50) per cubic yard." The appellees contend that the half-inch is really concrete of a richer mixture than the concrete masonry, but whether or not it can technically be said to be concrete, the contract undoubtedly makes a distinction between "concrete" and "plastering," as those terms are used in it.

It is apparent then that the terms used are not so clearly in favor of the appellees that a decision against them was palpable error or suggestive of bad faith on the part of the engineer, and hence we must see whether by the terms of the

contract it was for the Court or the engineer to determine the question. It is conceded by the appellees that there was no bad faith on the part of the engineer, but it is claimed by them that no authority was given him to construe the contract. It will be remembered that the contract was awarded "subject to all conditions, covenants, stipulations, terms and provisions contained in certain specifications, a copy of which is hereto attached and in all respects made a part hereof." Amongst other provisions is: "Section 6. Engineer to be referee. To prevent disputes and litigations, the engineer shall in all cases determine the *amount,* quality and acceptability of the work *which is to be paid for* under the contract; shall determine all questions in relation to said work and the performance thereof, and shall in all cases decide every question which may arise relative to the fulfillment of the contract on the part of the contractor. His estimate and decision shall be final and conclusive, and in case any question shall arise between the parties *touching the contract,* such estimate and decision shall be a condition precedent to the right of the contractor to receive any moneys under the contract."

That section in terms authorizes the engineer to determine *the amount* of the work which is to be paid for under the contract. It would be difficult to imagine any question which might have arisen which more clearly comes within that provision than the one we are now considering. If he could not determine whether the amount was to include the thirteen or twelve inch sewer *plus the half-inch of plastering on* it, or was not to so include the half-inch, then what could he determine under that provision? Then it also says: "His estimate and decision shall be final and conclusive, and in case any question shall arise between the parties touching the contract, such estimate and decision shall be a condition precedent to the right of the contractor to receive any moneys under the contract." This was cer-

tainly a question which arose between them *"touching the contract."*

This is not like the case of *Aetna Indem. Co.* v. *Waters,* 110 Md. 673, relied on by the appellees. In that case it was simply agreed that the architect's decision "as to the true construction and meaning of the *drawings* and *specifications* shall be final," and we said that did not take from the Court and confer upon the architect the power to construe the contract itself. JUDGE SCHMUCKER said: "The law is clear that the common right of resort to the courts for the determination of the rights of parties or the settlement of disputes between them will not be taken away by inference or implication or anything short of a distinct agreement to waive it. No such agreement is found in the contract before us, which in terms limits the architect's authority to determine the meaning and construction of the drawings and specifications prepared by him, but does not submit to his decision the contract rights of the parties." After citing authorities he went on to say: "The question before us is not one of the construction of the drawings and specifications under which the contract is to be performed, although the ascertainment of their true meaning may afford some assistance in its solution. It is a question of the construction of the contract itself to determine whether, under its provisions, the concrete company was under any obligation at all to construct the disputed ceiling."

In that case "The items constituting the concrete construction contracted for are not enumerated in precisely the same language in the sub-contract as in the specification." That was a suit by a contractor on the bond given him by a sub-contractor. In this case section 8, which referred to "Discrepancies in plans and specifications," provided that "Should there be any discrepancies in or between, or should any misunderstanding arise as to the import of anything contained in the plans and specifications, the decision of the engineer shall be final and binding." Therefore it might

well be contended that the engineer was required to decide under that section "the import" of the provision in reference to payment for the plastering.

Nor do we find anything in the case of *Annapolis & Baltimore Short Line Railroad Company* v. *Ross,* 68 Md. 310, which can aid the appellees. The work contracted for was to be done under the direction of the defendant's engineer, and he was to be the sole judge of the quantity and quality of the work, and his decision was to be final and conclusive between the parties. The railroad company reserved the right to make alterations, "provided, however, that no alteration shall be made from said plan which shall entail upon the plaintiffs an expense in constructing beyond the proportion of the balance of the work." The alterations did entail upon the plaintiffs an expense far beyond the cost of the original work contracted for, and the engineer awarded the plaintiffs very much less than they claimed, and the difference was the subject-matter in dispute in that case. JUDGE ROBINSON, in speaking for the Court, said: "That alterations were made and that the cost of constructing the bridges was thereby largely increased is not denied; and the real question is whether the alterations were such as the defendant had the right under the contract to make? If they were, then in the absence of bad faith or fraud on the part of the engineer, and this is not imputed, his award is final and conclusive. On the other hand, if the alterations are not fairly within the scope of the contract, his award is not binding, because his arbitrament was to be final only in regard to the work done under the contract." It was of course for the Court to construe the contract in so far as it was necessary to determine whether the work was done under it. It is true the engineer was to be the sole judge of the quantity and quality of the work, and his decision was to be final and conclusive between the parties; but, as the Court said, "only in regard to the work done *under the contract.*" There

were no such provisions in that contract as some of these in this.

But if we assume that the Court can determine whether the plastering was done under the contract, there can be no possible doubt about that. It was admittedly done under the contract, and the engineer was by its terms authorized to determine the question in dispute. If the engineer had determined that the plaintiffs were entitled to be paid half or a quarter of what they claimed, it could not be contended that his decision would not have been final, and when he determined that they were paid, in the price paid for the masonry, why is it not under the provisions we have quoted equally final and conclusive? The rules as announced in *Lynn* v. *B. and O. R. R. Co.,* 60 Md. 404; *B. and O. R. R. Co.* v. *Brydon,* 65 Md. 198; *Smith* v. *Jewell,* 104 Md. 269; *Pope* v. *King,* 108 Md. 45; *Seventh Baptist Church* v. *Andrews & Thomas,* 115 Md. 535. *Filston Farm Co.* v. *Henderson,* 106 Md. 335, and similar cases are too well settled to require discussion of the general principle that parties can legally leave questions of this character to the decision of their parties, such as engineers, architects and others, and that when they do they are bound by such decision, if made in good faith, and there are many cases holding that they can leave the construction of the contract itself to them. It seems clear to us that these parties left to the engineer the decision of the question now being considered, and there was error in not admitting the evidence offered in the first bill of exceptions and in granting the plaintiffs' first prayer.

*Second*—Without discussing it in any other respect, we think the ruling in the second bill of exceptions was correct, because the witness by his previous answers had shown that he was not sufficiently certain about the bill in question to testify as to it.

*Third*—The plaintiffs' second prayer and the defendant's first and second will be considered together. One of the contracts provided for the appellees constructing the out-

fall sewer in an easterly direction from the intersection of Chase and Durham Streets under Chase Street for several blocks. Wolfe Street runs north and south and is parallel with and a short block east of Durham Street. At the intersection of Chase and Wolfe Streets the appellees had contracted to construct a syphon under the outfall sewer for the purpose of conveying the water of an old storm-water drain running in a southerly direction under the bed of Wolfe Street and crossing Chase Street, which runs east and west. The old drain had a diameter of eight feet and the new outfall sewer had a width of seventeen feet four inches, outside measurement, and a height at the crown of the arch of about eleven feet.

In the bed of Chase street from its intersection with Durham there were two water mains of the city, one twenty and the other ten inches in diameter. They came inside of the line of the trench of the sewer and were about four and a half to five feet below the surface of the street. Upon finding those obstructions, the contractors asked the Sewerage Commission to move those pipes and they agreed to do so— the contractors agreeing to dig trenches for them at twelve and a half cents a foot as extra work. They did dig the trenches for a distance of four hundred feet on Chase street, but the Water Department moved the twenty-inch main about thirty feet and then said they would move it no further on account of a high pressure main at Wolfe and Chase streets and the Ls and bends necessary. They moved the ten-inch pipe from the line of the sewer. At the intersection of Chase and Wolfe streets the twenty-inch water main connected with another twenty-inch main running through Wolfe street. The Chase street main was two or three feet above the Wolfe street main, and there was a connection there, by an L, so that the two pipes were connected.

The old drain intersected the plane of the new sewer and hence the old one had to be lowered. That was done by taking up the old one for about eighty feet, dropping it down

and forming a syphon low enough to permit the new one to pass over the top. The appellees contracted to do that work. There was a concrete pier, with a brick top, at the intersection of the two twenty-inch pipes at the corner of Chase and Wolfe. The concrete of that pier was about six feet square and the brick on the concrete about four feet. The pier went down about fifteen or eighteen feet to the bottom of the old sewer and rested partly on the ground and partly on the side of the arch of the old sewer. It was right in the line of the new sewer—"into the barrel of the sewer," as it was described by a witness, and the new sewer could not be built without removing it. It was at the point where the two water mains join, but Mr. Connett, division engineer of the Sewerage Commission, said it "was placed there, not for the purpose of supporting the pipes, but to prevent the pipes from blowing out under the water pressure"—although it did apparently also afford some support.

There can be no doubt from the testimony that the water pipes at the intersection of Chase and Wolfe streets were not only dangerous, but added greatly to the difficulty of the work. There was very high pressure in the pipes, and one of the appellants testified that "It was dangerous for the men working underneath the pipes and in the trench in the neighborhood of the pipes because of the pressure in those pipes. If the pipes had settled one inch we would have drowned all the men in the sewer." The conditions were such there that it is not easy to understand why the city would have permitted, much less required the contractors to proceed without the pipes being first removed or in some way changed, but they were notified that they must proceed and take care of the obstructions themselves. They did build the sewer without the pipes being removed, but they claim that the work was done at a greatly increased cost by reason thereof. There seems to have been no knowledge by the contractors or the city officials of the conditions until the excavation for the trench for the sewer was begun. The plaintiffs' second prayer instructed the jury that if they found

from the evidence "that in making the excavation of Section No. 1 of the Outfall Sewer water pipes controlled or operated by the City of Baltimore and a brick and concrete pier, supporting one or more of said pipes, were uncovered by the plaintiffs, at or near the intersection of Chase and Wolfe streets; that said water pipes and pier followed the line or occupied the place of the sewer, or of the syphon mentioned in said contract, that then it was the duty of the defendant to cause said pipes and pier to be removed at the cost of the Sewerage Commission by the City Department having charge thereof," and if they found they were not removed the plaintiffs were entitled to recover such sum as the jury found sufficient to reimburse them for the extra cost," etc.   The plaintiffs rely mainly on Section 155, which is: "If upon excavating, it shall be found that any existing electric subways, water pipes or appurtenances, owned, controlled or operated by the city, follow the line or occupy the place of the sewer and appurtenances to be built under this contract, such existing electric subways, water pipes or appurtenances will be removed and relaid or rebuilt, at the cost of the Sewerage Commission, by the City Department having charge of such structures."

It is contended by the city that that provision only applied when the subways, water pipes or appurtenances are actually in the space which the sewer was to occupy when finished, and does not apply simply because they are in the trench excavated for the sewer.   The pier spoken of in the case is at least included in the term "appurtenances."   It helped to support or protect the high pressure pipe at the point of intersection with the one on Chase street and was in the space now occupied by the sewer.   Section 155 does not say "follow the line" *and* "occupy the place of the sewer and appurtenances," as the city seems to contend, as shown by its second prayer, but it says, "follow the line *or* occupy the place," etc.   While it is true that the pipe on Wolfe street had to cross the sewer at some point, in crossing Chase street, the one on Chase street did follow the line of the sewer and

Section 155 evidently was intended to meet such and similar conditions as existed at that point. It could not have been intended that a twenty-inch pipe intersected by a high pressure pipe of that diameter in the excavation for the sewer was to be taken care of by the contractors. The city authorities at first recognized the unreasonableness of such a contention and started to remove the pipe on Chase street, and it was only when the officer of the water department declined to go on with the removal that the engineer notified the contractors that they must take care of the pipes at the intersection of Wolfe and Chase streets.

The second prayer of the plaintiffs is however defective in that it assumes there was extra cost, and it is not clear from the record whether Section 155· is applicable to the syphon, although the prayer makes it so. The first and second prayers of the defendant were properly rejected. We have not in this connection discussed the powers of the engineer, as we do not think he had authority to disregard the provisions of Section 155 and thereby prevent recovery by the plaintiffs for the extra cost. Nor do we think that Sections 146, etc., cited by the appellant are applicable.

We do not understand the plaintiff's third prayer to be objected to, but we do not see upon what theory their fourth prayer could be sustained. It is not certain from the evidence what caused the break of the pipe on Monument street, between Patuxent street and Loney's lane, as the witnesses differed in their versions. Section 146 is headed, "Contractor to take risk of underground obstructions," and reads as follows: The contractor is to take all risks and to be responsible for all expense and damage attending the presence or proximity of any gas or water pipes, private sewers, public or private drains, subways, conduits, and all underground structures, where such pipes, sewers, drains, subways, conduits or other structures cross or appear in the trench in such manner as does not demand that they be shifted, accommodated or removed; also all such structures as above enumerated as are parallel with or adjacent to, but outside of said

trench." While some of the testimony of the appellees was
to the effect that this pipe sometimes ran into the trench and
sometimes outside, that of Mr. Connett was, "Witness had
never seen it before the accident happened, because it was
outside of the trench and covered up in the ground; after the
cave-in it broke and went into the trench about 100 feet, if
possible more." Moreover, the prayer seems to have been
on the theory that the pipe was outside of the trench. We
do not think this claim comes within Section 155, but within
Section 146 which does not entitle the plaintiffs to recover
for injury to their machinery, trench and other work. We
will consider later the right of the city to retain the cost of
repairs to or renewals of the water mains. For the reasons
given the fourth prayer should have been rejected.

The theory of the plaintiffs' fifth prayer was correct—and
the burden was on the defendant to establish its right to still
retain the sums withheld by it out of funds earned by the
plaintiffs. It might possibly have misled the jury as to some
items, but if so that can be guarded against on a new trial.
Even if the appellant is correct, that the engineer was author-
ized to determine what should be retained, the burden was
on it to prove that he did.

We have already referred to defendant's first and second
prayers. Its third was properly rejected. It relies on sec-
tion 60 of the contract, that the acceptance by the contractors
of the final payments should operate as and be a release, but
the evidence abundantly shows that the payments were ac-
cepted in most, if not all instances, with the distinct under-
standing that the plaintiffs were not to be barred by such
acceptance. Indeed in some instances the city did not know
just what the claims would amount to. It is of course proper
that the city be protected in every reasonable way in making
such contracts, but such provisions must not have unreason-
able constructions. It may well be questioned whether mu-
nicipalities, other public authorities and large private cor-
porations are not required to pay out more money for im-
provements by reason of some of the provisions they insert

in contracts of this character, than they would have to pay, as it may be that contractors sometimes make their bids higher than they would otherwise do, because they are too much subject to the will of an architect, engineer or other person in the employ of the municipality, public authorities or private corporation, and hence it is important for them as well as the contractors that any of the provisions which are likely to do the contractors injustice be liberally construed in their favor.

The defendant's fourth and fifth prayers require no further comment. The sixth was properly rejected, as what we have said about the sewer at the corner of Chase and Wolfe streets would be sufficient to require that action, even if there be no other reason. The seventh was also. If the plaintiffs' evidence be correct, there was at least such a palpable error in the amount retained by the Electrical Commission as to raise the question of good faith. The eighth and ninth were granted. The tenth and eleventh were properly rejected, as they also leave out of consideration the reasonablness of the charges made by the Water Department. Surely they can not be permitted to charge what they please, without the right to inquire into it. Section 147 requires the contractors to repair and make good at their own cost any damage or injury to gas or water pipes, etc., and that "Should the contractor fail to repair such damages or injury within a reasonable time, the engineer may, *after twenty-four* (24) *hours written notice,* have such repairs made and deduct the cost thereof from any amounts due or to become due said contractors." The provision as to the notice seems to have been ignored, at least in most instances, and to permit the Water Department to make the repairs and charge what it sees proper to charge, without the right to dispute it, would be giving the provisions of the contract greater effect than we would be authorized in doing. The thirteenth prayer is disposed of by what we have already said in reference to the plastering. The special exceptions to the fourth prayer were properly overruled. We will only add as to the clause in

that prayer that "The defendant is not entitled to retain out of moneys belonging to the plaintiffs in the defendant's possession the cost of any repairs to or renewals of said six-inch water main made necessary by the bad condition of said main, if the jury shall so find," that we see no objection to what we understand to be the theory of that. If the jury find the repairs or renewals of that water main were the result of its bad condition, and not by reason of the plaintiffs' acts, they could not be required to pay for the cost of such repairs or renewals.

It follows from what we have said that the judgment must be reversed and a new trial awarded. In anything we have said, we did not mean to impugn bad faith to the engineer, but we do think that in some instances the contractors have not been treated as liberally as the evidence would have justified. The engineer is required to act in accordance with the terms of the contract, according to his best judgment, but if it be a fact, as their evidence shows, that the contractors misunderstood the terms, for example, as to the plastering on the extrados and manholes, and did not include the cost in their bids, the city itself certainly had the power to correct it. So in reference to the conditions at Chase and Wolfe streets, a liberal treatment of the contractors, instead of a strict construction of the provisions of the contract, would more likely result in full justice being done.

> *Judgment reversed and new trial awarded,*
> *the appellees to pay the costs.*