### SCHIAVI et al. v. MAYOR AND CITY COUNCIL OF BALTIMORE.

No. 633.

District Court, D. Maryland.

July 26, 1941.

Philip B. Perlman and Wirt A. Duvall, Jr., both of Baltimore, Md., for plaintiffs.

Charles C. G. Evans, City Sol., and Allen A. Davis, Asst. City Sol., both of Baltimore, Md., for defendant.

CHESNUT, District Judge.

On January 25, 1938, Vincent Schiavi entered into an elaborate and formal written contract with the Mayor and City Council of Baltimore for the construction of storm drains at the Municipal Airport in Baltimore City and Baltimore County, Maryland, in accordance with the award of the contract to him as the lowest bidder, after public advertisement, all in accordance with the requirements of the Baltimore City Charter. His aggregate bid for the work was for the base price of $172,-469.60. The bid was made on elaborate written specifications, plans and drawings for the work. The formal contract incorporates as a part thereof these plans and specifications, the whole comprising a document of about 35,000 words embraced in 75 pages of closely printed matter, in addition to the many plans and drawings.

The work was begun by the contractor in February 1938 and concluded March 23, 1939. As the work progressed monthly estimates of the value of the work done according to the contract price were estimated by the City's engineer and payments made to the contractor less the retained 10%. The contract contained particular provisions with regard to claims for extra work and cost of extra materials to be furnished by the contractor, which in substance were that such claims must be presented in writing within five days, must be followed within the month by itemized details and if not approved by the City's Sewerage Engineer who was in general charge of the work for the City, the controversy should be appealed to the Chief Engineer for the City whose decision was made a condition precedent to any recovery therefor under the contract. During the performance of the contract the contractor made no such claims for extra work or compensation in writing to the Sewerage Engineer.

The first claim of this nature made by the contractor was made verbally to Mr. George E. Finck, the City's Sewerage Engineer, after the completion of the contract, and was followed by the contractor's letter of April 22, 1939, to Mr. Finck. In this letter the contractor specified quantities of material and labor for which he claimed extra compensation, but without stating prices or amounts claimed. Mr. Finck replied by his letter of April 28, 1939, in which he itemized material for which he was willing to pay in accordance with the

terms of the contract in the amount of $14,949.80 for one class of material, and $2,171.34 for another. With the exception of these sums the Sewerage Engineer declined to approve the much larger claim of the contractor. In the meantime, or about that time, the contractor had retained counsel and on the advice of counsel an appeal was not taken to the Chief Engineer of the City but an "informal" conference with the Chief Engineer was requested and held. The results of the conference were purely negative, in that there was merely a general talk about the matter without submission of the controversy by the contractor to the Chief Engineer and without any decision by him upon it. Thereafter on April 2, 1940, the plaintiff filed suit in this case claiming by an amended bill of particulars the total amount of $101,795.84, with interest. The answer filed by the City admits that there is due to the contractor under the contract the following items: (1) Retained percentage $16,257.90; (2) additional amount due under final estimate (including the item of $2,171.34 above mentioned) $4,098.09; and (3) additional material (item above mentioned) $14,949.80, or an aggregate of $35,305.79, which amount it was willing to pay to the contractor less the sum of $5,200 deducted for liquidated damages at $25 per day for the contractor's delay in completing the work under the contract. But as a result of the trial the defendant has abandoned the claim of $5,200 for liquidated damages for delay, and is now willing to pay the sum of $35,-305.79 principal as the amount of its liability in this case. The work was a federal emergency public works project under which the United States Government through the W.P.A. contributed 45% of the total cost.

The items in dispute as contained in the plaintiff's amended bill of particulars filed June 27, 1941, fall into three main classes: (1) amounts claimed for slag in alleged excess of contract requirements in the aggregate of about $16,500; (2) the cost of construction (not including the cost of the lumber itself) by the contractor of special form of timber construction of sheathing of the trench in which the concrete storm drains were placed said to have been necessary to overcome special difficulties in constructing the trenches arising from the instability of the sub-soil at the Airport. The amount claimed for this labor and incidental items is about $40,000. And (3) Class A concrete used in connection with said special trench construction valued at about $15,000.

The plaintiff's theory of the defendant's legal liability is that all three of these items are not controlled by the contract and therefore the plaintiff is entitled to recover for their reasonable value on the basis of the *quantum meruit* outside of the contract. More specifically, the plaintiff's theory with respect to the excess slag used is that it was not provided for in the contract drawings and specifications and a unit price therefor was not included in the proposal, and therefore it is not within the terms of the contract. With respect to the extra labor in constructing the special timber for trench construction and the sealing of the trench at the bottom by the use of concrete, the plaintiff's contention is that when in the course of constructing the trenches unusual difficulties with respect to the instability of the sub-soil or mud were encountered, it was found impossible to continue the construction as provided for in the contract, and that "thereupon the contract plans, specifications and design of special structure intended for 'mud areas' was completely and finally abandoned by the defendant and the work was stopped."

On the other hand the defendant contends that all the work for which claim is now made was comprehended in and provided for by the terms of the contract and was subject in all respects to its provisions, and that the contract was completely performed by the contractor and was at no time either wholly or partly abandoned.

### Findings of Fact

From the extended testimony taken in the case I make the following findings of fact.

1. The contract was never abandoned in whole or in part by the parties but was completely performed by the contractor in accordance with the terms of the contract.

2. For some years prior to the making of the contract Baltimore City had been in the process of constructing an Airport. It was situated on the north side of the Patapsco River partly within and partly outside the limits of Baltimore City and originally consisted partly of fast land and partly of water. Over a period of years the City filled in the water and added to the fast land by various methods, partly by mud and partly by granular fill.

By paragraph 97 of the specifications the contractor's attention was specifically called

to the existing situation and conditions at the Airport and the contractor was required to "thoroughly familiarize himself with all the said work which has been done and is yet to be done at said Airport". And by paragraph 98 it was expressly provided that the contractor should make no claim for loss, costs, expenses or delays in any manner arising from the physical conditions in or about the site of the work whether on the surface or under ground, or changes in said physical conditions, or the instability, movement, shifting and settlement or displacement of materials within the Airport area; but if the contractor was delayed thereby he would be granted such additional length of time as was deemed reasonable by the Engineer.

3. Much of the whole work was completed by the contractor before special difficulties were encountered by him in the so-called mud area. When the latter difficulty was encountered the contractor found that the sheathing of the trenches by the ordinary wood timbers driven vertically down to a depth of about 16 feet to protect the sides of the trench while being excavated, was not sufficient to keep the soft mud on the outside of the sheathing from oozing under the sheathing and thus being forced by the outside pressure of mud into the bottom of the trench as it was being excavated. When this condition was encountered the contractor realized that he would have to adopt some different method to complete the work. He thereupon conceived the idea of a special form of timber construction for the sheathing of the sides of the trench consisting of overlapping or laminated timbers held in place by transverse timber construction of a special design which, in this case, he calls "assemblies and panels". He further supplemented these with the liberal use of concrete at the bottom of the excavation which acted as a "seal." This was an unusual and probably unique method of handling the situation and proved successful. It appears also that subsequently the contractor obtained a patent for this type of ditch construction. It was the testimony of the contractor, supported in part at least by two engineers, that the condition in the so-called mud areas for the trench construction was so unusual, if not unprecedented, that it was impossible to complete the work with the use of the ordinary type of sheathing comprehended by the specifications. On the other hand, the testimony of three City Engineers, including the City Sewerage En-gineer, was that the condition could have been met perfectly well by the use of longer or deeper timbers of ordinary construction; and that while the contractor failed to surmount the conditions by the use of timbers of only 16 feet depth, he could have successfully met the problem by the use of timbers not more than 30 feet in depth. As the trench was not required to be more than about 8 feet in depth, the effect of 30 foot timbers would have been sufficient to reduce the comparative pressure or dead weight of the material outside of the sheathing as compared with the pressure on the inside of the trench so that there would be no initial flow of mud from the outside of the trench into the bottom, and, as Mr. Pagon, the Consulting Engineer for the City, explained, the element of additional friction would also have been a factor in preventing this initial flow. Or, in other words, if 30 foot timbers had been used the ditch could have been excavated to the depth required without further difficulty. On this conflicting evidence I accept that of the defendant's engineers as the more weighty and the more probable.

4. The plaintiff's testimony was to the effect that when the unusual difficulty in the mud areas was encountered he conferred with the City's Engineers upon the project, including Mr. Finck, and told them that if deeper timbers were used for sheathing, whether of wood or metal, they would have to be left in place after the work was completed and would therefore under the provisions of the contract have to be paid for by the City at a very considerable expense, possibly so much as $200,000, and certainly very much more than the extra sum which the plaintiff is now claiming for the labor cost of constructing the special assemblies and panels of wood. And it was because of this situation as realized by the City's Engineers that he was permitted to adopt his special form of timber construction. And he said that at the time he stated that he would expect to be paid for the extra work. On the other hand the testimony of Mr. Finck and Mr. Moore, Assistant Engineer on the work, was that the plaintiff had never expressed any intention to make claim for the extra cost, and that the plaintiff on his own initiative devised the special form of timber construction in order to decrease the cost to himself which he would have incurred if he had had to use the 30 foot timbers instead of 16 foot timbers. In this respect the specifications merely were that the trenches should be

sheathed by approved timber construction without limiting or specifying the required length. And the contract also provided a unit price for the trench construction per linear foot and did not prescribe the particular manner in which the trench construction should be carried out by the plaintiff. Two other Assistant Engineers or inspectors for the City on the work testified that while they had on one or more occasions heard the plaintiff say in an incidental or informal way that he *hoped* the City would pay him extra for the special construction, he did not ever say to them that he *expected* such additional compensation.

I find as a fact by the weight of the testimony that the plaintiff did not at any time during the progress of the work make any claim either verbal or in writing, for extra compensation by reason of the special timber construction used in the trenches in the mud areas: and no promise either express or implied was made to pay him extra compensation therefor.

5. As to the claim for excess slag, I find that the plaintiff at no time during the progress of the work made any claim either verbally or in writing, for additional compensation for excess slag placed by him around the concrete drain pipes, beyond the amount required by the contract. Plaintiff's claim as to the excess slag is comprised of three separate items. (1) For excess slag caused by the use of slag in places called for by the drawings, but in excess quantities, in the amount of $3,539.45; (2) slag placed around the so-called *standard cradles* used to hold the concrete sewer pipe, in the amount of $8,194.60; and (3) for slag placed around the cradles or concrete pipes in the area known as the Airport Runways, in the amount of $4,895. As to the first item, I find from the testimony that the so-called excess slag was voluntarily placed by the plaintiff in lieu of a certain amount of earth filling of the trenches because the plaintiff found it less expensive to use more slag and less earth under working conditions. As to the second and third items for excess slag, the plaintiff's contention is that the drawings did not call for slag at the particular locations, and that nevertheless he was verbally ordered by the City's Engineer on the work to use slag at those locations. By the specifications the City's Sewerage Engineer was authorized to interpret the drawings and specifications as the work progressed. Mr. Finck, the Sewerage Engineer, pointed out in his testimony that while the drawings may not have specifically noted the requirements for slag at these particular locations, the whole nature of the work clearly indicated to any competent and experienced contractor (as the plaintiff clearly was) the necessity for slag, a porous material, immediately adjacent to and around the sewer drains, all of which were clearly shown to have had so-called "weep" holes therein for the purpose of receiving under-surface drainage. The question as to whether slag was required in the particular locations did not arise until after the work had very largely progressed, and then the matter was submitted by Mr. Moore, Mr. Finck's assistant, to Mr. Finck for his interpretation of the drawings. Finck interpreted the drawings and specifications to require the use of slag at the particular locations; and the engineer on the work told the contractor to place slag there and the contractor met the requirements without protest and made no claim for additional compensation therefor until after the work had been completed.

6. The City did not expressly or impliedly at any time waive the provisions of the contract with respect to claims for extra compensation by the contractor. Nor is there any sufficient evidence of estoppel against the City to rely upon the provisions of the contract in this respect.

7. When the controversy arose between the contractor and Mr. Finck, the Sewerage Engineer, with respect to additional compensation, the contractor refused and declined to submit the matter for decision to the Chief Engineer of the City. In this respect, section 56, p. 16 of the specifications of the contract, provided:

"To prevent disputes and litigations, the Chief Engineer will be the referee in case any question shall arise between the Contractor and the City touching the Contract, and his determination, decision and/or estimate shall be final and conclusive upon the Contractor, and shall also be a condition precedent to the right of the Contractor to receive any moneys under the contract."

8. The contract specifications (paragraph 17, p. 22) provided further with respect to sheathing for protecting the sides of the ditches, and paragraph 35, p. 33, provided as follows:

"The Contractor will be paid only for such sheeting, sheet-piling, braces, shores, etc., which are left in place by written order of the Engineer. Payment will be

made for the actual cost of this lumber at the current market price at the time it is purchased by the Contractor who shall submit to the Engineer receipted bills or other evidence as the Engineer may require to show the price paid for all timber on which the above-mentioned payment is to be made. * * * No payment shall be made for any sheeting, sheet-piling, braces, shores, etc., left in place unless specifically ordered by the Engineer nor will any payment be made for cutting off, removing and otherwise handling the lumber but all such costs and incidental work shall be included by the Contractor in the linear foot price bid for excavation."

The special timber construction used by the contractor in the so-called mud areas was so built or constructed around the concrete drains that it was practically impossible physically to remove the timber from the ditch after the drains had been constructed. The City was not necessarily obligated under the contract to pay the lumber cost of this special construction; but in view of the situation the Sewerage Engineer agreed to do so. In view of the contract specifications for the whole work, I do not find that the City arbitrarily treated the contractor in this respect.

As a part of the claim for extra compensation for this special construction, the contractor claims the following items.

| | |
|---|---|
| Labor | $14,708.84 |
| Supervision | 2,000.00 |
| Overhead | 1,791.72 |
| Profit at 15% | 4,448.87 |

I find the contractor is not entitled to any of these items.

As to the labor cost, the amount claimed is at best an estimate on some partial data as to the labor cost of constructing about 25 of the much more numerous units therefor. The contractor did not keep any itemized or other exact figures of the cost to which the City would have been entitled under the contract specifications if the claim were otherwise allowable. The estimate of the City's Engineer as to the probable labor cost varied greatly from the contractor's estimate and was much less than that of the contractor. If allowable at all the amount would have to be based on an estimate only without definite supporting data. The item of "supervision" was included by the advice of an engineer representing the contractor called in only after the work was completed. The item is based on an estimate of the value of the services of the contractor personally. There is no sufficient supporting data and the item would not be allowable if the claim generally was otherwise allowable. Likewise there is no sufficient supporting data for the item of overhead, and the item of 15% profit in the amount of $4,448.87 is, I think, clearly not allowable under the contract. None of these items would be properly allowable except on the plaintiff's theory of recovery of *quantum meruit* consequent upon the abandonment of the contract, which I do not find occurred.

9. The contractor claims about $16,000 extra compensation for Class A concrete used to "Seal" the trenches in the mud areas, in connection with the special construction of sheathing above referred to. It is said that Class A concrete is more expensive than Class B, which might have been used. I find that the contractor used Class A concrete at his own option. Included in the sum conceded by the City to be due is an item of $2,171.34, which is allowed on the theory that if timber had been used by the contractor instead of concrete he would have been entitled to payment therefor to the extent of this item. I find the contractor is not entitled to any extra allowance for Class A concrete beyond this sum.

10. The contractor also claims extra compensation for "trimming" concrete in the amount of $5,118. I find he is not entitled to this allowance because the extra work was necessarily performed by him to remedy faults in construction.

 The principal contention of the plaintiff on the·law of the case is that, where a contractor with a municipal corporation performs work or supplies materials which are not included in his contract, and they are accepted and retained by the municipal corporation and are beneficial to it, there arises an implied obligation on the corporation to pay therefor on the basis of the reasonable value thereof, that is, on a *quantum meruit*. And it is said that this rule also applies where the contract itself is invalid and would be unenforceable if still executory, by reason of failure by the municipal corporation to comply with some of the provisions of its charter or local governing law. I think the Maryland cases do support this rule. Konig v. City of Baltimore, 128 Md. 465, 97 A. 837; Mayor & City Council of Baltimore v. J. A. Kinlein, 118 Md. 336, 343, 84 A. 483; Gaver

v. Commissioners of Frederick County, 175 Md. 639, 649, 3 A.2d 463. See, also, Transbay Const. Co. v. City & County of San Francisco, D.C., 35 F.Supp. 433, and note in 110 A.L.R. 153. It is also the Maryland rule that where a contractor undertakes to do certain work for an owner, and in the performance thereof unforeseen and not contemplated difficulties arise and thereupon the owner promises to pay the contractor additional compensation, the latter may recover therefor on a *quantum meruit* or for the additional price agreed upon. Linz v. Schuck, 106 Md. 220, 67 A. 286, 11 L.R.A.,N.S., 789, 124 Am.St.Rep. 481, 14 Ann.Cas. 495; People's Banking Co. v. Fidelity & Deposit Co., 165 Md. 657, 676, 170 A. 544, 171 A. 345; United States for Use of Wilkinson v. Lange, D.C.Md., 35 F.Supp. 17, affirmed, 4 Cir., June 10, 1941, 120 F.2d 886. In this respect the Maryland law is, of course, controlling in this case. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

■ But these principles of law are not applicable here in view of the finding of facts. There was no promise on behalf of the City to pay extra compensation and the work and material for which the extra compensation is claimed in this case (above the amount conceded to be due) was not outside of the contract. Furthermore the contract itself contains specific provision with respect to required procedure by the contractor in relation to claims for extra compensation, including particularly the provision that any dispute with respect thereto between the Sewerage Engineer and the contractor must be submitted to the Chief Engineer whose decision would be a condition precedent to the contractor's recovery therefor. These contract provisions are valid and binding (Baltimore City v. M. A. Talbott & Co. 120 Md. 354, 360, 363, 87 A. 941; Id., 133 Md. 226, 246, 105 A. 149; Baltimore v. Ault, 126 Md. 402, 414, 424, 94 A. 1044; Baltimore City v. Clark, 128 Md. 291, 308, 97 A. 911; Filston Farm Co. v. Henderson & Co., 106 Md. 335, 336, 367, 67 A. 228), have not been waived, and I have found no evidence in the case to indicate any estoppel against the City to rely on them. The evidence does not show anything indicating fraud or unfairness on the part of the City in reliance upon the contract provisions.

Counsel for the plaintiff earnestly stress the argument that, in the performance of the work, the contractor encountered great and unexpected difficulties in the mud areas, was obliged to devise an entirely new type of trench construction at great cost to himself and with resulting substantial loss on the whole contract; and that the City has accepted and obtained the benefit of this work and has also received and accepted the benefit of materials and work by the contractor beyond the quantities required by the contract which the City is not willing to pay for; or, in short, that the City has been *unjustly enriched* at the expense of the contractor. This argument is chiefly based on the testimony in the case submitted by the plaintiff and his witnesses, without sufficient regard for the opposing testimony submitted by the defendant which, as indicated in the above findings of fact, I have in many respects found more weighty. As to the plaintiff's claim that he has sustained great loss on the contract, it is relevant to note that no definite figures of such loss have been submitted in the case, except insofar as they might possibly be inferred from the plaintiff's claim for extra compensation.

■ But even if the testimony could be found to support the plaintiff's claim that he had performed work and supplied materials in excess of the contract requirements, he would not be entitled as a matter of law to recover therefor in this suit in view of his apparent entire disregard for the contract requirements with respect to payment of extra compensation. The plaintiff's position in this respect seems to be very largely that these contract provisions are little more than mere formalities to be observed or not at the option of the parties. I cannot accede to this view. The provisions of the contract with respect to the determination of extra compensation by the City's Sewerage Engineer subject to review on appeal to the Chief Engineer of the City, have been considered and sustained as valid and enforceable, in the absence of fraud, bad faith or waiver, in numerous Maryland decisions, some of which have been above cited. See, also, La Porte Corporation v. Mayor and City Council of Baltimore, D.C. Md., 13 F.Supp. 795, Judge Coleman. They are not mere formalities but are vital and substantial provisions in elaborate contracts of this character. Their very particular

purpose is to avoid such litigation as we have in this case over alleged extra compensation due to a contractor. This consideration has been repeatedly stated in the Maryland cases of Baltimore Cemetery Co. v. Coburn, 7 Md. 202, 203, 207, 209; Abbott v. Gatch, 13 Md. 314, 329, 330, 71 Am.Dec. 635; and O'Brien v. Fowler, 67 Md. 561, 564, 11 A. 174. The plaintiff in this case was not unfamiliar with the requirements of similar contracts. He is a contractor of large experience and has had a number of somewhat similar contracts with the City, and the testimony in the case shows that on some occasions he has been allowed extra compensation when applied for in accordance with the requirements of the respective contracts. No sufficient reason is shown in this case for his failure to comply with the conditions of this contract if he felt that he was entitled to extra compensation. If, as he contends, he was required during the performance of the contract to do work and supply extra materials not called for in the contract, he had the option to refuse to do so until the extra compensation was agreed to by authorized City officials, and if they unreasonably refused to allow the extra compensation in accordance with the terms of the contract, the plaintiff could have abandoned the work and thereafter maintained suit for damages properly due him. But this he did not do. On the contrary he completed the work without complying with the provisions of the contract as to extra compensation, submitted his claim therefor not within the time required by the contract but only after the whole work was performed, and then on the rejection of the larger part of his claim by the Sewerage Engineer, declined to submit the controversy to the Chief Engineer of the City as provided for in the contract. Under these circumstances I am obliged to hold as a matter of law that he cannot recover in this case.

Counsel for the plaintiff have suggested that the court might reserve decision on his claims for the slag pending an appeal now to be taken to the Chief Engineer with respect to that item, before proceeding to the final disposition of claims for other items in suit. But it is not apparent how the plaintiff's entire claim can properly be split up in this fashion. Of course the plaintiff can dismiss or withdraw his claim on any of the disputed items if desired. But it is by no means clear that if this is done there would be a right to re-litigate

that item in court if it were rejected by the Chief Engineer. Nor is it apparent how such further litigation could be successful for the plaintiff contrary to the decision of the Chief Engineer unless the latter was in some way infected with fraud or bad faith.

■ The necessary *conclusion of law* is that the plaintiff is entitled to recover the sum of $35,305.79 only. As the City was willing to pay this amount to the contractor upon the final completion of the work and in accordance with the terms of the contract, but the contractor refused to accept it as full payment, I do not think any interest should be allowed on the amount now due. The clerk is instructed to enter judgment for the plaintiffs as their interest may appear in the amount of $35,305.79.