# MAYOR AND CITY COUNCIL OF BALTIMORE

## *vs.*

## DAVID V. AULT AND MARTIN J. BEACH,
### Trading as D. V. Ault & Company.

*Building contracts: matters left to decision of third parties; effect of—; must be honest and own decision; direction of superior officers; questions for jury.*

Where a building contract provides that a certificate, estimate, determination or decision of an architect, engineer, or some third person shall be final and conclusive, such decision, etc., is binding upon the owner, builder and other parties to the contract; providing the decision concerns matters within the scope of the submission, and also provided the decision, etc., is made by such architect, engineer, or other third person, in the exercise of his honest judgment.                     p. 424

To show *bad faith,* that would prevent such decision, etc., from being binding, it is not necessary that the decision should be the result of a deliberate purpose to defraud, or to deprive a party to the agreement of the benefit of the contract.      p. 429

Where matters connected with a contract are made to depend upon the decision of a named official, his honest decision, how-

ever erroneous, is binding upon the parties; but nothing short of his said decision would gratify the contract; and any decision which was *not* the judgment of such official, but was the mere expression of the views, or the influence of others, whether intentionally or innocently exercised, would be outside the contract and without force. p. 429

Whether such decision was in fact the decision of such official, or whether it was but following the estimate made by other officials, is a question for the jury. p. 434

The weight of the evidence offered by the official, as to how he arrived at his figures, after he had received instructions from his superior officers, and the deductions to be drawn therefrom, are for the jury. p. 435

A court is not bound to prepare instructions of its own, and if it does do so, and its instruction is otherwise free from error, it can not be objected to, on the ground that they fail to include instructions asked for in prayers that were properly rejected.

p. 434

*Decided June 23rd, 1915.*

Appeal from the Superior Court of Baltimore City. (STUMP, J.)

The facts are stated in the opinion of the Court.

The following are the prayers in the case, and the action of the Court on each, and the instructions of the Court offered of its own motion:

*Pltffs.' 1st Prayer*—The plaintiffs pray the Court to instruct the jury that if they shall find from the evidence that the defendant delayed the progress of the work of the plaintiffs under the contract offered in evidence by failing to acquire the land lying on the south side of old Pratt street between East Falls avenue and President street, or failing to

remove the buildings that were erected upon said land (if the jury shall find from the evidence such failure on the part of the defendant), or if the jury shall further find from the evidence that the defendant delayed the prosecution of said work on the part of the plaintiffs by failing to cause the prompt removal and realignment of the gas mains and railroad tracks mentioned in the evidence (if the jury shall find from the evidence such failure on the part of the defendant), or if the jury shall further find from the evidence that the defendant delayed the work of the plaintiffs under said contracts by work done upon the site thereof by any of the City Departments (if the jury shall find from the evidence that the work of said departments did delay the work of the plaintiffs), that then the plaintiffs are entitled to such additional time for the performance of their work as shall be equal to the time that the jury shall find from the evidence that the plaintiffs were delayed in the performance of their work, as the result of such aforesaid delays as shall be found by the jury. (*Refused.*)

*Pltffs.' 2nd Prayer*—The plaintiffs pray the Court to instruct the jury that if they shall find from the evidence that the plaintiffs and defendant entered into the contract offered in evidence, and shall further find from the evidence that Mr. Oscar F. Lackey signed the twenty-nine estimates, numbered from 1 to 29 inclusive, offered in evidence, and shall further find from the evidence that the defendant has not paid to the plaintiffs the entire sum of $98,356.70, mentioned in estimate No. 29 as the value of the work done to the date of said estimate (if the jury shall so find), that then the burden of proof rests upon the defendant to establish its right to retain any part of said sum, provided the jury shall find from the evidence that the defendant is now retaining or withholding any part thereof. (*Refused.*)

*Pltffs.' 3rd Prayer*—The plaintiffs pray the Court to instruct the jury that if they shall find from the evidence that the statement enclosed in the letter of Mr. Oscar F. Lackey

to the plaintiffs bearing date June 12th, 1913 (if the jury shall find that said letter and statement were sent to the plaintiffs by the said Oscar F. Lackey), was not an expression of the uncontrolled and independent judgment and opinion of the said Oscar F. Lackey, but that said statement was made by the said Oscar F. Lackey because of instructions or requests of either the Board of Awards of the City of Baltimore, the City Solicitor of said city or the Mayor of said city, that then said statement is not binding or conclusive upon the plaintiffs. (*Refused.*)

*Pltffs.' 4th Prayer*—The plaintiffs pray the Court to instruct the jury that in order that any decision or certificate of the Harbor Engineer of the City of Baltimore upon any question arising between the plaintiffs and the defendant touching the contract offered in evidence, or the work performed thereunder, shall be final, binding and conclusive upon the plaintiffs, such decision or certificate must express the independent judgment of said engineer unaffected by either the orders, instructions, advice or determination of any officer, official or board of the defendant. (*Refused.*)

*Pltffs.' 5th Prayer*—The plaintiffs pray the Court to instruct the jury that if they shall find from the evidence that the Harbor Engineer of the City of Baltimore rendered any decision or made any certificate with reference to any question between the parties touching the contract offered in evidence, and shall further find from the evidence that in rendering such decision or making such certificate, the plaintiffs were not informed that such act was about to be performed, and shall further find from the evidence that no copy of such decision or certificate was furnished by said engineer or by any other representative of the defendant to the plaintiffs, that then such decision or certificate is not binding or conclusive upon the plaintiffs. (*Refused.*)

*Pltffs.' 6th Prayer*—The plaintiffs pray the Court to instruct the jury that if they shall find from the evidence that shortly after the work covered by the contract offered in evi-

dence was completed (if the jury shall find from the evidence that it was completed) the plaintiffs requested the Harbor Engineer of Baltimore City to issue a certificate of the completion and acceptance of said work, but that said Harbor Engineer declined to do so, and that in so declining was influenced by the letter of his Honor the Mayor of Baltimore, bearing date the 12th day of April, 1913, offered in evidence (if the jury shall find such letter was in fact written by the Mayor to said Engineer), that then the plaintiffs' failure to produce a certificate of the said engineer of the completion and acceptance of the said work does not constitute a bar to the plaintiffs' right to recovery in this action. (*Refused.*)

*Pltffs.' 7th Prayer*—The plaintiffs pray the Court to instruct the jury that by the true construction of the contract offered in evidence the plaintiffs are to be allowed 150 consecutive working days from the time when they received notice to commence work, and that by "consecutive working days" is meant days consisting of eight hours each, excepting Sundays and legal holidays, and that the consecutive sequence of said days is not affected by days when in the judgment of the engineer it is raining too hard at 8.00 A. M. to permit work; but that such consecutive sequence is destroyed by interruption with the plaintiffs' work caused by delays on the part of the defendant (if the jury shall find such delays from the evidence) in acquiring the property on the south side of Pratt street between East Falls avenue and President street and the removal of the buildings therefrom, or by the removal of the gas mains and railroad tracks mentioned in evidence, if the jury shall find that such removal interrupted the work of the plaintiffs.    (*Refused.*)

*Pltffs.' 8th Prayer*—The plaintiffs pray the Court to instruct the jury that the Engineer of the Harbor Board is not authorized by the terms of the contract offered in evidence to bind the plaintiff by his decision, determination or certificate as to the effect upon the rights of the plaintiffs of any

delays caused by the defendant, in case the jury shall find
from the evidence that the defendant did delay the perform-
ance of said work.   (*Refused.*)

*Pltffs.' 9th Prayer*—The plaintiffs pray the Court to in-
struct the jury that if their verdict is in favor of the plain-
tiff, that it is within the discretion of the jury to allow the
plaintiff interest at the rate of 6 per centum per annum from
forty days after the date when the work covered by the con-
tract offered in evidence was completed.   (*Granted.*)

*Pltffs.' 10th Prayer*—The plaintiffs pray the Court to in-
struct the jury that if they shall find from the evidence that
the defendant has not paid to the plaintiff the full amount of
the contract price for work and labor performed by the plain-
tiff under the contract offered in evidence, that then the bur-
den of proof is on the defendant to establish by a fair pre-
ponderance of evidence its right to still retain the sums with-
held by it out of funds earned by the plaintiffs under said
contract, if the jury shall so find.   (*Refused.*)

*Pltffs.' 11th Prayer*—The plaintiffs pray the Court to in-
struct the jury that if they shall find from the evidence that
the Engineer of the Harbor Board rendered a decision upon
the question of the responsibility of delays in the perform-
ance of the work under the contract offered in evidence and
that said decision was not communicated to the plaintiffs,
that then the plaintiffs are not bound thereby.   (*Refused.*)

---

*Deft.'s 1st Prayer*—The Court instructs the jury that un-
der the contract offered in evidence, the Harbor Engineer was
authorized to determine all questions in relation to said work
and the performance thereof, and to decide every question
which might arise between the parties touching the contract,
and his estimate and decision was, by agreement of the par-
ties, made final and a condition precedent to the plaintiffs'
right to recover, and that upon the undisputed evidence in
this case the Harbor Engineer did, in August, 1913, render

his decision upon every question in dispute between the parties, and did send a statement to the City Comptroller showing his decision, and that, according to said decision, there is now due to the contractor the sum of five thousand six hundred and eight-seven and 72/100 ($5,687.72), with or without interest thereon, in the discretion of the jury, from the time when the same was due and payable; that there is no evidence in this case legally sufficient to show that the Harbor Engineer was guilty of any fraud or bad faith in the rendering of said decision, and, therefore, the same is binding in this case, and the verdict of the jury should be in accordance therewith. (*Refused.*)

*Deft.'s 2nd Prayer*—The Court instructs the jury that under the contract offered in evidence, the Harbor Engineer was authorized to decide the number of working days which elapsed between the one hundred and fifty working days allowed in the contract, and the completion of the work, for which the contractor should be charged the liquidated damages of twenty-five dollars per day, as agreed upon in the contract, and if the jury find that the Harbor Engineer did, in August, 1913, take up and consider that question and did decide that the contractor should be charged with four hundred and eighty-two working days, at the stipulated liquidated damages of twenty-five dollars per day, then said decision by said Harbor Engineer is binding upon the jury, and the jury should be governed thereby in finding their verdict, unless the jury find that in making such decision the said Harbor Engineer was guilty of fraud or bad faith. (*Refused.*)

*Deft.'s 3rd Prayer*—The Court instructs the jury that under the contract in this case the plaintiff undertook to complete the whole work specified in the contract within one hundred and fifty (150) working days after August 31st, 1910, and by said contract the contractor agreed that the city might deduct from the amount of the contract price the sum of twenty-five dollars ($25.00) a day for every day which

might elapse between the expiration of the one hundred and
fifty (150) working days after August 31st, 1910, and the
date of completing the work; and that the term "working
days" means every calendar day, except Sundays and holi-
days, and days where it was raining too hard at 8.00 o'clock
in the morning, in the judgment of the Engineer, to permit
work; that from the total number of working days that
elapsed between August 31st, 1910, and the date of the com-
pletion of the work, the contractor was also entitled to an
allowance for such number of working days, if any, as the
jury may find the final completion of the work was delayed
by the work of the Water Department, Electrical Commis-
sion and the Sewerage Commission, or either of them, or by
the delay in the removal of the Scarlett and other buildings,
between East Falls avenue and President street, provided
the jury find, and only so far as the jury may find, that the
final completion of the work was delayed by the delay in
the removal of said buildings; and after crediting the con-
tractor with such allowances, if any, as the jury may find he
is entitled to under this instruction, and with the one hun-
dred and fifty (150) days to which he was entitled by the
contract, and after making these deductions the jury should
deduct from the amount remaining of the contract price
twenty-five dollars ($25.00) a day for every working day
that elapsed between August 31st, 1910, and the date of the
completion of the work.  (*Refused.*)

*Deft.'s 4th Prayer*—The Court instructs the jury that, un-
der the contract offered in evidence, the removal of the side-
walk of the old bridge and the removal of the pavement of
the old bridge were parts of the work for which the con-
tractor was to be paid the amount specified in the contract
and, therefore, the contractor's claim for one hundred dollars
($100.00) for cutting off the sidewalk of the old bridge and
for extra compensation for removing the pavement of the old
bridge, were properly disallowed by the Harbor Engineer,
and should be disallowed by the jury.  (*Refused.*)

*Deft.'s 5th Prayer*—The Court instructs the jury that, under the contract, the contractor is only entitled to be paid for the number of feet of piles cut off and in place; that upon the undisputed evidence the Harbor Engineer has made the proper allowance for the number of piles cut off and in place, and, therefore, the Harbor Engineer properly disallowed the claim of the plaintiff for additional allowance for piles, and the same should be disallowed by the jury. (*Refused.*)

*Deft.'s 6th Prayer*—The Court instructs the jury that at the time of entering into the contract, the contractor knew that the pipes of the Gas Company and the tracks of the United Railways and the Baltimore and Ohio would have to be removed from the old bridge to the new bridge, during the progress of the work; that it was his duty, in making his agreement as to the number of working days in which he would complete the contract, to make allowance for the reasonable time that would be required in the removal of said pipes and said tracks, and, therefore, the contractor is not entitled to any allowance for the time occupied by the Gas Company in the removal of their pipes, or for the time occupied by the United Railways and the Baltimore and Ohio in the removal of their tracks, there being no evidence in this case to show that any unreasonable time was taken either by the Gas Company or by the United Railways or by the Baltimore and Ohio, in such removal, unless the jury find that the necessary work of the Gas Company occupied more time, because of the delay of the city in the removal of the Scarlett and other buildings, and if the jury so find, then the plaintiff is entitled to an allowance for the difference between the time which the Gas Company actually occupied and the reasonable time that they would have occupied if said buildings had been removed sooner. (*Refused.*)

*Deft.'s 7th Prayer*—The Court instructs the jury that they should not regard or be influenced by anything they may have heard stated by counsel during the progress of the trial,

either as an offer of proof or otherwise, but the verdict of the jury should be founded exclusively upon the evidence which the Court has admitted in this case. - (*Granted.*)

Thereupon the Court refused all the prayers offered on behalf of the plaintiff, except the ninth, and refused all the prayers offered on behalf of the defendant, except the seventh, and in lieu thereof gave the following instruction of its own to the jury, which is as follows:

(*First*) : That under the terms of the contract between the parties the plaintiffs promised to complete the work in 150 working days next following the award of the contract, with allowance to plaintiffs for all Sundays, legal holidays and days in the judgment of the Harbor Engineer too rainy at 8.00 A. M. for the prosecution of the work, and the plaintiffs further consented that the defendant should be entitled to deduct from the contract price $25.00 for each working day that elapsed after the expiration of the said 150 contract days to the time of the completion of the work, making allowance for Sundays, legal holidays and days too rainy at 8.00 A. M. in the judgment of the Harbor Engineer for the prosecution of the work.

(*Second*) : That the Harbor Engineer had the right to make a *bona fide* decision binding upon the plaintiffs upon all questions arising under the contract as to the acceptability of the work and allowances of time to the contractors, and charging the contractors for overtime at $25.00 per day, with the qualification that if the jury finds from the evidence that the defendant upon the award of the contract had failed to receive and turn over the possession to the plaintiffs of any portion of the area within which any of the work was to be done, then the jury are to pass upon and allow plaintiffs for the number of working days they may find from the evidence, if any, the plaintiffs were thereby actually delayed or interfered with in the prosecution of the work, taking into

consideration, however, any other area not provided for in the contract which they may find from the evidence was turned over by the city to and accepted by the plaintiffs for use in the prosecution of the work.

(*Third*) : That if the jury find from the evidence that the Harbor Engineer prior to the institution of this suit decided the number of working days consumed by the plaintiffs in the completion of the work, then they shall consider said decision as binding upon the plaintiffs, provided they find from the evidence that notwithstanding any opposition or interference on the part of other persons the decision of the Harbor Engineer was *bona fide*, but the jury must allow for those days, if any, they find from the evidence whereon the plaintiffs were interfered with by any delay on the part of the city in turning over any part of the area where the work was to be done.

(*Fourth*) : The plaintiffs are not entitled to extra compensation by reason of the removal of the sidewalk and pavement of old bridge, and are entitled to be paid for piles in the number of feet remaining after they were in place with the tops cut off.

(*Fifth*) : The defendant was bound to make the plaintiffs an allowance for the number of days, if any, the plaintiffs were delayed beyond a reasonable time for the proper removal of all pipes and tracks required by the contract to be removed by the Gas Company, Electrical Commission, Water Department and Railway Companies. But a *bona fide* decision of these questions by the Harbor Engineer is binding upon plaintiffs, if the jury find such *bona fide* decision. Although if the jury find from the evidence that the Gas Company's work required longer for prompt execution on account of any failure of the city to turn over to the plaintiffs the Scarlett or other property under the contract, the plaintiffs are entitled to an allowance for such extra time.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER and STOCKBRIDGE, JJ.

*S. S. Field,* the *City Solicitor* (with whom was *Alexander Preston, Deputy City Solicitor,* on the brief), for the appellant.

*J. Kemp Bartlett* (with whom was *L. B. Keene Claggett, R. Howard Bland* and *Robert D. Bartlett* on the brief), for the appellees.

THOMAS, J., delivered the opinion of the Court.

In June, 1910, the Mayor and City Council of Baltimore passed an ordinance for the widening of Pratt street from East Falls avenue to President street, the next street east, by establishing the southern building line of Pratt street about seventy feet further south. East Falls avenue runs along the east side of Jones' Falls, and was from thirty to thirty-four feet wide. Pratt street, which was a much used thoroughfare about sixty-five feet wide, crossed the Falls by a bridge on which there were two tracks of the United Railways and one track of the B. & O. Railroad. The space between East Falls avenue and President street, which was to be acquired by the City and included in the bed of Pratt street, was covered by buildings occupied by William G. Scarlett and others, and on the opposite or west side of the Falls the City had constructed a pier known as Pier 6, which extended from Pratt street into the harbor. The proposed improvement involved the acquisition by the City of the strip of land referred to to be added to the bed of Pratt street east of the Falls; the removal of the buildings thereon; the erection of a new steel and concrete bridge, about one hundred and twenty-eight feet wide, over the Falls; the removal of the old bridge and two large gas mains which spanned the Falls just south of the old bridge; the paving of the new portion of Pratt street, and the repaving or paving of the approaches to the new bridge, etc. After the ordinance was passed the Commissioners for Opening Streets, as required by the Baltimore City Code, published a notice that

they would meet to assess damages and benefits for the widen-
ing of Pratt street, and that their first meeting would be
held on August 1st, 1910. Bids for the work of constructing
the new bridge, removing the old bridge, paving and repav-
ing, etc., were received until August 17th, 1910, and on
the 31st of August, 1910, the contract for the work was
awarded by the Board of Awards to the appellees, David V.
Ault and Martin J. Beach, co-partners trading as D. V.
Ault & Co., who on the 7th of September, 1910, entered into
a contract with the City to furnish the labor and materials,
etc., and to do the work in accordance with the specifications
thereto attached and made a part thereof, at and for the
rates and prices in the schedule attached to the contract, and
to complete the "whole contract * * * within 150 working
days after August 31, 1910." Persons proposing to bid for
the work were notified that the specifications and plans for
the work could be obtained at the Harbor Engineer's office,
and the specifications required bidders to make a "personal
examination of the plans, the site and surroundings thereof,
and of the nature and character of the work required." The
specifications also contained the following provisions:

"*Disputes and Litigation*—To prevent disputes and
litigations, the Harbor Engineer shall in all cases deter-
mine the amount, quality and acceptability of the
work which is to be paid for under the contract; shall
determine all questions in relation to said work, and
the performance thereof, and shall in all cases decide
every question which may arise relative to the fulfill-
ment of the contract on the part of the contractor.
His estimate and decision shall be final and conclu-
sive, and in case any questions shall arise between the
parties touching the contract, such estimate and deci-
sion shall be a condition precedent to the right of the
contractor to receive any monies under the contract.

"*Time Required*—Bidders must state the number of
consecutive working days required to complete the
work. A working day shall consist of eight hours of
each and every day except Sundays and holidays as

set aside by the National Government, the Governor
of Maryland, or the Mayor of Baltimore. If it is
raining too hard at 8 A. M., in the judgment of the
Engineer, to permit work, such day shall not consti-
tute a working day. In computing the lapsed number
of working days, no allowance for bad weather or
other delays not covered by the preceding clause, will
be made unless claim for exemption has been made
within 48 hours of the time the delay occurs. The
Contractor must begin the work within 15 days after
notice to do so, and must complete the work within
the time specified. Should the Contractor fail to
complete the work within the time specified, he shall
forfeit to the City as liquidated damages, and not as
a penalty, the sum of $25.00 for each and every day
which may elapse between the limiting date and the
completion of the work.

"*Payments*—Monthly estimates will be made on 80
per cent. of the work done, and 40 days after the
completion and acceptance of the work by the Engi-
neer all sums then remaining due will be paid to the
Contractor. Payments may at any time be withheld
if the work is not proceeding in accordance with the
contract, or if, in the judgment of the Engineer, the
Contractor is not complying with the requirements
of the contract and specifications. Whenever, in the
opinion of the Engineer, the Contractor shall have
completely performed the contract on his part, the
Engineer shall so certify in writing to the Harbor
Board, and in his certificate shall state, from actual
measurements, the whole amount of the work done by
the Contractor and also the value of such work under
and according to the terms of the contract. On the
expiration of 40 days after the completion of the work
herein to be done by the Contractor, and the filing
by the Contractor in the office of the Comptroller of a
certificate of the completion and acceptance of the
work, made by the Engineer and the Harbor Board,
the City shall pay to the Contractor the amount or
value stated in the above-mentioned certificate, after

deducting therefrom all such sums as shall theretofore have been paid to the Contractor under any of the provisions of this contract, and also all sums of money which by the terms hereof the City is or may be authorized to reserve or retain, * * * All monthly estimates upon which partial payments have been made, being merely estimates, shall be subject to correction at any time without notice to the Contractor.

"*General Method of Procedure*—The bridge will probably have to be constructed in three sections. The first section will extend from the south end up to the gas mains of the Consolidated Gas Company. When the first two or three ribs are completed, with the necessary beams, etc., the Gas Company will change their mains over to this new portion and remove the old mains, and the Contractor will remove the south sidewalk of the present bridge, or perhaps the entire south half of it, after which another section of the new bridge may be completed. This latter section will include at least two of the ribs designed to carry the railway tracks, and upon its completion the railway tracks will be laid thereon and permanent or temporary paving will be laid on the completed portion of the bridge. Traffic will then be turned on this part of the new bridge, when the rest of the old bridge may be removed and the new one completed. * * * There are a number of pipes, conduits, etc., within the lines of the excavation which will be abandoned or removed by the City, as the work progresses. All abandoned conduits, pipes, etc., shall be removed by the Contractor, as excavation.

"*Special Items to be Included in Unit Prices Provided*—The Contractor will be furnished with a pipe to carry a 24-inch sewer through the east abutment, and with other pipes, etc., that may be required for openings through the new work, but the labor of placing and caring for these openings must be borne by the Contractor without expense to the City. * * * Attention is called to the location of the 76-inch interceptor sewer adjacent to the bridge. The new abutments

will be built up against the walls of this sewer, but
excavation will not extend under the sewer founda-
tions, etc.

"*Suspending Work*—The Harbor Board reserves the
right to suspend the whole or any part of the work to
be done hereunder, if it shall deem it for the interest
of the City to do so, without compensation to the
Contractor for such suspension, other than extending
the time for completing the work as much as it may
have been delayed by such suspension."

The work under the contract was, according to the testi-
mony of Mr. Ault, begun between the 10th and 15th of Sep-
tember, 1910, and was not completed until the 15th or 20th
of April, 1913. In the meantime monthly estimates and
certificates of the work and material and the value of same
were made by the Harbor Engineer, and Ault & Co. were
paid the amounts shown to be due, less the "percentage"
retained under the terms of the contract and specifications.
In April, 1913, Ault & Co. received from the Harbor Engi-
neer an estimate designated "Estimate No. 29," showing
that the value of the work done and material furnished by
them from March 15 to April 15 was $5,070.13; that the
total value of work and material to date was $98,356.70;
that the amount previously paid was $74,629.28; that the
amount due under that estimate, after deducting the 20 per
cent., was $4,056.10; that the total percentage retained was
$19,671.32, and, as appears from the estimate and certificate
offered in evidence, that the $4,056.10, due under that esti-
mate, was paid to them April 29th, 1913. The work and
material referred to in that certificate included all the work
done and material furnished by Ault & Co. under the con-
tract, and to the amount there shown to have been paid them
there should be added $1,833.60 paid by the City "on ac-
count of piling" and $100.00 which Ault & Co. agreed to
pay for the old bridge. On the 12th of April, 1913, the
Mayor of Baltimore wrote the Harbor Engineer that there
would be no waiver of penalties chargeable under the con-

tract until the question had been passed upon by the Board
of Awards, and requesting the Engineer to let him know the
status of Ault & Company's account before any further pay-
ments were made, and the Harbor Engineer notified Ault &
Co., by letter of April 15th, 1913, that he had been directed
to withhold further payments until matters pertaining to
the delay in the construction of the bridge had been pre-
sented to the Board of Awards. On June 12th, 1913, the
Harbor Engineer wrote to Ault & Co. enclosing them "a final
statement for work done" under the contract, in which he
deducted from the total value of the work and material
shown by "Estimate No. 29" $12,400.00 for a delay in the
completion of the work of 496 working days, at $25.00 per
day, and later the Board of Estimates wrote Ault & Co.,
offering to pay them the balance due them after deducting
$12,050.00 for 482 working days' delay and certain claims
against them. Ault & Co. refused to accept the amount so
offered, and in March, 1914, brought this suit in the Su-
perior Court of Baltimore City against the City to recover
$17,837.72, balance due for work done, etc., under the con-
tract; $1,277.15 for extra work, and $19,382.34 as dam-
ages resulting from delays in the work caused by the City,
less $100.00, the purchase price of the old bridge.

This appeal is by the City from the judgment recovered
against it for $17,310.46. The record contains nearly one
thousand pages of testimony and twenty-one exceptions to the
rulings of the lower Court on the evidence and prayers. The
evidence offered in support of the plaintiffs' claim for dam-
ages was excluded by the Court below and is not in the
record, and the lower Court having instructed the jury that
the plaintiffs were not entitled to recover the amounts claimed
by them for extra work and materials, we are only con-
cerned on this appeal with the claim of the City to liqui-
dated damages for the failure of the plaintiffs to complete
the work within the time limited in the contract.

As in our view of the case the judgment will have to be
reversed and the case remanded for a new trial, we will

refrain from referring to or discussing the evidence further
than is necessary in order to pass upon the questions raised
by the exceptions, the most important of which are presented
by the prayers.

The work done by the plaintiffs consisted mainly of con-
structing the new bridge, removing the old bridge, paving the
addition to the bed of Pratt street, and paving or repaving
the approaches to the new bridge. In order not to stop the
travel on Pratt street, the specifications provided that the
new bridge would have to be constructed in three sections.
The evidence adduced by the plaintiffs is to the effect that
when they began the work in the fall of 1910, and undertook
to erect a derrick on East Falls avenue to be used in exca-
vating for the foundation of the east abutment of the first
section of the bridge, they were prevented from doing so by
Mr. Scarlett, who occupied the building on a part of the land
that was to be acquired by the City for the widening of
Pratt street, and who, claiming that it would interfere with
the use of the side entrances of the building in receiving and
shipping produce, threatened to apply for an injunction
against them. Mr. Ault reported the matter to the Harbor
Engineer, who said that he would see the Commissioners for
Opening Streets about it and let him know. The title to
the land to be included in the bed of Pratt street was ob-
tained by the City during the spring and summer of 1911,
and the Scarlett building and other buildings were not re-
moved until about the first of December, 1911. In the
meantime the plaintiffs completed the first section of the
bridge, which was fifty-five feet wide, but Mr. Ault stated
that owing to the fact that the proximity of the building did
not leave them sufficient room for the full use of their appli-
ances, and they did not have the use of the land covered by
the buildings as a place to deposit the "excavation," it took
them five times as long to do the work as it would have
taken if the building had been out of their way, and that the
plaintiffs claim that the 150 working days in which they
contracted to do the work should therefore be "accounted

from" the first of December, 1911, when the buildings were removed. Other evidence was offered by the plaintiffs that their work was further delayed by the moving of gas mains, etc., by the Gas Company; by the transfer of the tracks from the old bridge to the new bridge by the Railways and Railroad Companies; by work done by the Electric Commission, Sewerage Commission and Water Board, and that they were also delayed because the Gas Company, which, by reason of the fact that the Scarlett and other buildings were not removed from the land referred to, had to extend its mains down East Falls avenue in order to connect with its mains on President street, instead of following the bed of Pratt street. The claim of the plaintiffs is that the time lost by the delays referred to, when added to the number of Sundays, holidays and rainy days on which they could not work, accounts for their failure to complete the work within the 150 days allowed by the contract.

They also offered evidence for the purpose of showing that the statement or estimate of the Harbor Engineer of the number of days delay for which they were responsible, and for which they were liable, under the terms of the contract, to be charged $25.00 per day as liquidated damages, was not his decision, but that his judgment in the matter was influenced and controlled by the conduct and views of the Mayor and other City officials. This evidence will be more particularly referred to when we come to consider the prayers.

The defendant offered evidence tending to show that in the summer of 1910 the plaintiffs were paving Pier 6, which is on the west side of the Falls and opposite the Scarlett building, under a contract with the City, and that at the time the ordinance for the widening of Pratt street was being passed and they were bidding for the contract for the construction of the new bridge, and at the time the contract was awarded to them, they knew that the City had just begun proceedings for the acquisition of the Scarlett and other properties to be included in the proposed addition to Pratt street east of the Falls; that the Scarlett building did not prevent the build-

ing of the bridge, the first section of which was completed
before the building was removed, and did not delay the work;
that the east abutment of the first section of the bridge, which
was about thirty feet from the building, was built in a
shorter time than the west abutment of that section, where
there were no buildings to interfere with the work; that the
only use the plaintiffs could have made of the land covered
by the Scarlett building and the other buildings was as a
place to store their materials, and that the City had at the
beginning of the work given them permission to use Pier 6,
the area of which was greater than the space occupied by
those buildings. The testimony of the Harbor Engineer,
the inspectors on the work, the timekeeper of the Harbor
Board, who kept the record of the number of men at work
on the bridge, etc., and other witnesses for the defendant,
was to the effect that the work done by the Railroad and
Railways Companies, the Sewerage Commission, Water
Board, Electric Commission and Gas Company did not cause
the delays testified to by Mr. Ault; that the plaintiff did not
commence the work until October, 1910, and did not com-
plete it until May 9th, 1913, and that the real causes of the
delay in the completion of the bridge were the failure of the
plaintiffs to employ sufficient force and equipment and the
lack of competent direction and supervision of the work.
Repeated complaints were made to the Mayor and Harbor
Engineer about the delay in the construction of the bridge,
and the plaintiffs were advised of these complaints. In Sep-
tember, 1912, the City authorities threatened to "annul"
the contract, and Mr. Ault appeared before the Board of Esti-
mates and promised that if he was allowed to finish the work
he would put on an extra force and complete it by the fol-
lowing November. According to a strict interpretation of
the specifications the bridge was not completed until the 9th
of May, 1913, but as the "traffic had used the bridge on
April 5th, 1913," the plaintiffs were allowed the twenty-four
days between the 5th of April and the 9th of May, 1913.
Between the 31st of August, 1910, and the 9th of May, 1913,

there were thirty-two holidays, one hundred and thirty-nine Sundays and one hundred and eight rainy days, and after deducting the number of holidays, Sundays, rainy days, the 150 days in which he was allowed to do the work, the 24 days between April 5th and May 9th, 1913, and 46 days for such other delays as the plaintiffs were entitled to claim credit for, there remained a delay of 482 working days for which the plaintiffs were responsible. The defendant also offered evidence for the purpose of showing that the Harbor Engineer, in determining the number of days for which the plaintiffs were entitled to credit, relied upon his personal knowledge of the manner in which the work was performed and the records kept during the progress of the work, and that he was not influenced or embarrassed in his decision by the conduct or views of other City officials.

At the conclusion of the testimony the plaintiffs offered eleven prayers and the defendant seven. The Court below rejected all of the plaintiffs' prayers except the ninth and all of the defendant's except its seventh, and granted an instruction of its own. The correctness of this ruling is challenged in the twenty-first exception. The *Reporter* is requested to set out the plaintiffs' ninth prayer, the defendant's rejected prayers and the Court's instruction in his report of the case. The general rules and principles by which we are to be governed, in disposing of the questions thus presented are fully recognized in the decisions of this Court.

In the case of *Geiger* v. *The Western Md. R. R. Co.,* 41 Md. 4, the contractor undertook to complete a certain division of the appellee's railroad within eight months. The work was begun in June, 1871, but owing to the financial embarassment of the railroad company and its difficulty in securing the right of way, it was in a measure suspended and was not actively resumed until April, 1872. The contract provided that in case it should appear to the chief engineer that the work did not progress with sufficient speed he might annul the contract. The work not having progressed as rapidly as the engineer thought it ought to have done, the contract

was annulled, and in disposing of the question of the right of the engineer to do so after the work had been resumed under the circumstances stated, the Court said: "There is no proof to show that the contractors were hindered or in any manner delayed in the progress of the work, by the company, after it was resumed in April, 1872. * * * Whatever may have been the delay in the progress of the work in 1871, resulting from the failure of the appellee to acquire the right of way, or whatever inconvenience and loss the contractors may have sustained by the non-payment of the monthly estimates, these facts in no manner affected or impaired the right of the engineer to annul the contract for the failure to prosecute the work with proper speed after it was begun in April, 1872. Owing to financial embarrassments of the appellee, the work was in a measure suspended in the latter part of 1871, and when by the aid of city's subscription, it was enabled to resume the construction in 1872, the work was to be prosecuted according to the terms of the contract." In the case of *United Surety Co.* v. *Summers*, 110 Md. 95, the suit was on the contractor's bond for breaches of the contract which contained a provision that the work was to be completed in seventy working days, and that the contractor should pay fifty dollars per day for each day the completion of the work was delayed beyond that time. There were cross-appeals, and one of the exceptions of the plaintiff was to the refusal of the lower Court to grant his second prayer, which was as follows: "Upon the prayer of the plaintiff the Court instructs the jury that if they shall find from the evidence that the said work was not completely finished within seventy working days, accounting from the day of the commencement thereof and adding to said seventy working days all working days during which the jury shall find from the evidence said work was delayed by the architects and builders of the plaintiff, then the plaintiff is also entitled to recover from the defendant by way of additional damages the sum of fifty dollars for every day in excess of said seventy working days occupied by said Lawrence and

the defendant upon said work, and said additional days during which the jury shall find said work was delayed by the architects and builders of the plaintiff down to the time when they shall find the plaintiff took possession of said building." This Court, after holding that the provision in the contract in regard to fifty dollars per day was a stipulation for liquidated damages, said that the plaintiff's second prayer should have been granted. The same principle was followed in the case of *Pittsburg Iron Co.* v. *Nat. Tube Co.,* 184 Pa. 251, 39 Atl. 76. In the case at bar the contract provided that the bridge was to be completed within 150 working days, and, according to the rule stated, the fact that the work was unnecessarily or unreasonably delayed by the City or its agents, or by the Railways Company, Railroad Company or Gas Company, would not deprive the City of the benefit of that provision or the stipulation in regard to liquidated damages, but the contractors would be entitled to credit for such delays in arriving at the number of working days the work was extended beyond the 150 days' period.

It is said in 6 *Cyc.* 40: "Where the building contract expressly provides that a certificate, estimate, determination, or decision of an architect, engineer, or some third person shall be final and conclusive, it is a well settled rule that such certificate, estimate, determination, or decision is conclusive and binding in its legal operation and effect upon the owner, the builder, and the other parties, if any, to the contract, including those guaranteeing its faithful performance, * * * provided the decision concerns matters within the scope of the submission to him, and also provided the decision, determination, estimate, or certificate is made by such architect, engineer, or third person in the exercise of an honest judgment." In the case of the *Annapolis and Baltimore Short Line Co.* v. *Ross,* 68 Md. 310, JUDGE ROBINSON, speaking for the Court, said: "That alterations were made and that the cost of constructing the bridges was thereby largely increased is not denied; and the real question is whether the alterations were such as the defendant had the right under

the contract to make. If they were, then in the absence of bad faith or fraud on the part of the engineer, and this is not imputed, his award is final and conclusive. On the other hand, if the alterations are not fairly within the scope of the contract, his award is not binding, because his arbitrament was to be final only in regard to the work done under the contract." In the case of *Mayor and City Council of Balt.* v. *Talbott,* 120 Md. 354, where the specifications contained the same provision found in the specifications in this case, CHIEF JUDGE BOYD, after quoting the above statement of JUDGE ROBINSON, said: "It was of course for the Court to construe the contract in so far as it was necessary to determine whether the work was done under it. It is true the engineer was to be the sole judge of the quantity and quality of the work, and his decision was to be final and conclusive between the parties; but, as the Court said, 'only in regard to work done *under the contract.*' There were no such provisions in that contract as some of these in this.

"But if we assume that the Court can determine whether the plastering was done under the contract, there can be no possible doubt about that. It was admittedly done under the contract, and the engineer was by its terms authorized to determine the question in dispute. If the engineer had determined that the plaintiffs were entitled to be paid half or a quarter of what they claimed, it could not be contended that his decision would not have been final, and when he determined that they were paid, in the price paid for the masonry, why is it not under the provisions we have quoted equally final and conclusive? The rules as announced in *Lynn* v. *B. & O. R. R. Co.,* 60 Md. 404; *B. & O. R. R. Co.* v. *Brydon,* 65 Md. 198; *Smith* v. *Jewell,* 104 Md. 269; *Pope* v. *King,* 108 Md. 45; *Seventh Baptist Church* v. *Andrews & Thomas,* 115 Md. 535; *Filston Farm Co.* v. *Henderson,* 106 Md. 335, and similar cases are too well settled to require discussion of the general principles that parties can legally leave questions of this character to the decision of third parties, such as engineers, architects and others, and that when

they do they are bound by such decision, if made in good
faith, and there are many cases holding that they can leave
the construction of the contract itself to them. It seems clear
to us that these parties left to the engineer the decision of
the question now being considered, and there was error in
not admitting the evidence offered in the first bill of excep-
tions and in granting the plaintiffs' first prayer." To the
cases referred to by CHIEF JUDGE BOYD we may add the
recent case of *Hughes* v. *Model Stoker Co.*, 124 Md. 283.
In the case now under consideration, the specifications, in
order to prevent disputes and litigations, provided that the
Harbor Engineer "shall determine all questions in relation
to said work, and the performance thereof, and shall in all
cases decide every question which may arise relative to the
fulfillment of the contract on the part of the contractor."
One of the provisions of the contract to be fulfilled by the
contractor was that the work was to be completed within 150
working days, and it is clear that the Harbor Engineer was
authorized to decide whether that provision had been com-
plied with, and in doing so to determine the number of days
for which they were entitled to credit, in order to decide
how many *working days* they were engaged in the work. He
could not, of course, deprive the City of the benefit of the
stipulation in regard to liquidated damages, or withhold
from the contractors credit for any delays for which they
were not responsible. These rights were secured to the City
and to them by the contract. But he *was* authorized to decide
what delays the contractors were subjected to and the *extent*
of those delays, otherwise he would be unable to decide
whether the contractors had fulfilled the contract. What we
have said applies as well to the delay claimed to have been
caused by the Scarlett building and other buildings on the
land included on the bed of Pratt street. The buildings
were there when the contract was executed, and there was no
stipulation in the contract that the 150 working days were
not to begin until the buildings were removed. The only
work to be done by the plaintiffs on that land was paving,

etc., and the *extent* to which that work, or any other part of the work contemplated by the contract, was unreasonably delayed by the fact that the buildings were not removed until December, 1911, and the plaintiffs were deprived of the use of East Falls avenue in consequence thereof was, by the terms of the specifications, left to the decision of the Harbor Engineer.

In the case of *Lynn* v. *B. & O. R. R. Co.,* 60 Md. 404, Judge Miller said: "If Legge's refusal to approve was brought about at the instigation, or by the procurement of the defendant company, this would undoubtedly have dispensed with the condition and allowed a recovery." After stating that there was no evidence in the case to show that the refusal was procured by the company, he said in reference to the averment that Legge fraudulently rejected the ice: "In the present case the party to inspect and approve was in fact, and by the agreement was required to be, an agent of the company, and his sole duty was to determine whether the ice which the plaintiff proposed to deliver corresponded in size and quality with the specifications contained in the contract. We are all of opinion that if a jury, upon sufficient evidence, should find that this agent rendered a fraudulent judgment, or, what is the same thing, rejected the ice in bad faith, the company would be responsible." After referring to the case of *Wilson* v. *R. R. Co.,* 11 G. & J. 68, in support of the statement that gross negligence would not, in contemplation of law amount to fraud or want of *bona fides,* he said further: "By this contract, which is perfectly lawful, the parties expressly agreed to submit the question whether the ice supplied was 'good, clear, and solid,' to the judgment of this third party, and his judgment, no matter how erroneous and mistaken it may be, or how unreasonable it may appear to others, is conclusive between the parties, unless it be tainted with fraud or bad faith. To substitute for it the opinions and judgments of other persons, whether judge, jury or witnesses, would be to annul the contract, and make another in its place." In the case of

*B. & O. R. R. Co.* v. *Brydon,* 65 Md. 198, the Court said:
"The Baltimore and Ohio Railroad Company contracted with
William A. Brydon to purchase from him a large quantity
of coal. It was agreed that Brydon was to deliver to the
Railroad Company, daily, not less than one hundred and
fifty and not more than three hundred tons of coal, of such
quality as should be satisfactory to the railroad's master of
transportation and master of machinery; that the deliveries
should commence on the 15th of July, 1875, and should con-
tinue for three years. The price agreed to be paid was $1.50
a ton. After a considerable quantity of coal had been deliv-
ered the Railroad Company refused to receive any more,
because it was condemned as unsatisfactory by the masters
of machinery and transportation. At the trial below, the
Court ruled that if the rejection of the coal was not made in
good faith it would not be a sufficient justification to the
Railroad Company in refusing to accept it. The correctness
of the opinion of the Court as a legal proposition was not
questioned in the argument of the case. It was fully sup-
ported by the decision in *Lynn* v. *R. R. Co.,* 60 Md. 404.
But it was earnestly maintained that there was no evidence
in the case proper to be submitted to the jury to show want
of good faith." After referring to the testimony in the case,
and particularly to the statement of a witness that the master
of transportation had said to him that the coal was satisfac-
tory to him, "but that his action had been dictated by Mr.
Garrett, his superior officer, because of the steamer trouble,"
the Court said further: "By the terms of the contract the
whole decision was committed to them (the masters of ma-
chinery and transportation); if they made their decision
against the coal in good faith, the defendant would not be
obliged to accept it, but if they fraudulently rejected it,
their judgment would be without effect in law, and the de-
fendant would not be excused by it." The Court then stated
that in such cases "the evidence should take a wide range.
It was competent to show to the jury what knowledge, and
what means of knowledge the defendant had of the coal from

the plaintiff's mine before and at the time of the contract;. and every fact and circumstance which would show what. expectations it might reasonably and justly form in respect to its fitness for the purposes to which it was to be applied. It was proper also to show whether the coal fulfilled these expectations, and whether the officers who were to decide on its rejection.knew, or had the means of knowing, its quality; and whether there were any circumstances which might induce them to make an unjust decision in the interest of the defendant. It was proper also to prove acts, declarations or statements of these officers which would show what opinion they really had of the merits of this coal." The cases of *Filston Farm Co.* v. *Henderson,* 106 Md. 335; *Pope* v. *King,.* 108 Md. 37; *M. & C. C. of Balt.* v. *Talbott, supra; Hughes* v. *Model Stoker Co., supra,* and *Hickman & Co.* v. *Roberts and others,* L. R. App. Cases (1913), 229, are to the same effect. To constitute bad faith it is not necessary, however, that the decision of the person to whose judgment the matter is submitted shall be the result of a malicious and deliberate purpose to defraud or deprive a party to the agreement of the benefit of the contract. The agreement in this case was to submit the matters within the terms of the submission to the *decision of the Harbor Engineer,* and not to the judgment of any other person. His honest decision, however erroneous, would be binding upon the parties because the contract makes it so, but nothing short of that would gratify the terms of the agreement, and any decision which was not *his* judgment, but the mere expression of the views, or the influence of others, whether intentionally or innocently exercised, would be outside of the contract and without force.

Applying these principles to the ruling of the Court below on the prayers we discover no reversible error in the rejection of the defendant's first, third, fourth, fifth or sixth prayers.

On April 12th, 1913, the Mayor wrote the Harbor Engineer that there would be "no waiver of penalties for the non-completion of the work" by the plaintiffs until the question

had been passed upon by the Board of Awards, and requested the Engineer to let him know the status of the account before further payments were made, and on the 15th of April, 1913, the Engineer wrote Mr. Ault, in reply to a telephone message, advising him that he had been authorized by the Mayor to withhold further payments until all matters pertining to the delay in constructing the bridge had been presented to the Board of Awards. It appears from a letter of June 7th, 1913, from Mr. Field to the Board of Estimates, that the Engineer wrote the Mayor on April 16th, 1913, in response to the Mayor's letter of April 12th, that the number of working days, "as classified in the specifications," the plaintiffs were engaged in the work was 646, and that after deducting the 150 working days allowed by the contract there was a delay in the completion of the work of 496 working days. It is to be observed that in the letter of the Mayor no reference is made to the causes of the delay, and it only refers to the *waiver of penalties* which the City alone could do, and asked for information in regard to the status of the account, and that the Engineer in his reply stated that there was a delay of 496 working days in the completion of the work. But Mr. Ault testified that after he got the Engineer's letter of April 15th, 1913, he went to see the Engineer, who told him that his "recommendation" would be that the plaintiffs were entitled to all the money shown to be due by Estimate No. 29, and "that the delays suffered by the City were fully offset by the delays caused the contractors." Mr. Bartlett, one of the attorneys for the plaintiffs, referring to a visit to Mr. Lackey's office after Mr. Ault received the letter of April 15th, 1913, testified as follows: "I called at Mr. Lackey's office in the City Hall and I told him that I represented Mr. Ault, and that Mr. Ault desired him to pass upon and decide the question as to who was responsible for the delays, and I pointed out to him that the contract named him (Lackey) as the officer of the City who was authorized by the contract to decide that question, and I asked him, on behalf of Mr. Ault, to decide it. He told me

that he could not decide, because he had received instructions from his Honor the Mayor to·do nothing further in the matter, and he had referred, and was about to refer, the whole question of the responsibility for delays to the Board of Awards. I said, 'Mr. Lackey, you know that the Board of Awards has no authority to decide that question, and Mr. Ault is not willing that it should be decided by the Board of Awards, and he wants you to decide it.' Mr. Lackey said, 'I know that, Mr. Bartlett; but my hands are tied.' He said, 'I feel it would be insubordination on my part, if I were to pass upon that question in view of the instructions that I have received from my superior officer.' " On the 7th of June, 1913, Mr. Field wrote the Board of Estimates that the City was entitled to deduct $25.00 per day for the delay of the 496 working days stated in the letter of the Engineer of April 16th, 1913, to the Mayor, and on the 11th of June, 1913, the Board of Estimates wrote the Engineer that the Board had approved Mr. Field's recommendation of June 7th, a copy of which had been sent him, "in the matter of deducting liquidated damages from the final estimate of D. V. Ault & Co., for the construction of Pratt street bridge," and added, "and you are directed to please be governed accordingly. Final estimate dated April 15th-May 15th is herewith returned." On June 12th, 1913, the Engineer sent the plaintiffs the estimate we have already referred to, in which they were charged with a delay of 496 working days, and on the 17th of June, 1913, the Board of Estimates wrote Ault & Co., as follows: "Dear Sirs—Referring to your request, the Board of Estimates will give you an opportunity to be heard with your attorney and witnesses at its meeting next Tuesday, June 24th, in the Mayor's Reception Room, with regard to the City deducting liquidated damages from your final estimate for work on the Pratt street bridge. If, however, the City Solicitor is unable to attend, the hearing will have to be postponed." Mr. Bartlett stated that after Mr. Ault received this letter of June 17th, 1913, he went to see the Engineer on June 24th, prior to the hour of the

meeting of the Board, and showed him the letter, and further
testified as follows: "I said, 'Mr. Lackey, it is my opinion
that the City of Baltimore has no right to consult the Board
of Awards or anyone else in place of yourself, and I have
come here again to ask you on behalf of Mr. Ault to take up
this question of responsibility for delays and decide it.' He
said, 'Mr. Bartlett, I told you before how I was fixed. My
hands are tied, and I can't do it.' I said, 'Mr. Lackey, how
would you decide that question if you were allowed to decide
it?' He said, 'Mr. Bartlett, Mr. Ault was responsible for
some delays in the construction of that work, but the delays
for which the City was alone responsible greatly overbal-
anced any delays that can be charged to Mr. Ault.' I said,
'Mr. Lackey, it looks very much to me as if this case would
get into Court, and I would like to know what your position
is going to be if the case gets into Court?' He said, 'Mr.
Bartlett, the City of Baltimore is entitled to all of my time
and to the best energy and ability I have got, but it does not
own my conscience. That is all I can say to you about my
position in this matter.' " In view of this evidence, the de-
fendant's first prayer was properly refused. While it does
not contain any evidence of collusion, corruption or fraud on
the part of the Harbor Engineer or other City officials, it
was sufficient to go to the jury upon the question whether
the estimate made by the Harbor Engineer of the number of
working days the completion of the work was delayed was
in fact *his decision.* The defendant offered evidence in re-
buttal, and the Harbor Engineer explained the conversations
referred to above, and stated that after the hearing referred
to in the letter of the Board of Estimates he went over the
records and papers with Mr. Field, and after giving the
plaintiffs the benefit of every delay they could possibly be
entitled to he reduced the number of working days for which
they were responsible from 496 to 482, and sent the Comp-
troller a statement to that effect, and that his estimate of
the number of days' delay for which the plaintiffs were
responsible was *his decision.* But the weight of the evidence,

and the inference to be drawn from it, was a matter exclusively for the jury.

Defendant's third prayer was defective because it failed to allow the plaintiffs for any unreasonable delays caused by the Gas Company, Railways Company and Railroad Company. Its fourth and fifth prayers were covered by the Court's instruction, and its sixth prayer, in so far as it was free from objection, was also covered by the Court's instruction. The plaintiffs offered some evidence tending to show that they were unreasonably delayed by the Gas Company and the Railways and Railroad Companies. The instruction granted by the Court was defective in several particulars. The second paragraph in effect instructed the jury that the Harbor Engineer had no authority to pass upon the question of delay caused by the failure of the City "to turn over the possession to the plaintiffs of any portion of the area within which any of the work was to be done," and that they should allow the plaintiffs for the number of working days "they may find from the evidence, if any, the plaintiffs were thereby actually delayed or interfered with." We have already said the Harbor Engineer was authorized by the contract and specifications to decide the extent of the delay, if any, caused by the failure of the City to remove the Scarlett building and other buildings prior to the beginning of the work. We also think that the expression "or interfered with" was misleading. The plaintiffs were only entitled to be allowed for such interference as delayed the completion of the work. The third and fifth paragraphs are open to the objection stated in reference to the second paragraph, and the third paragraph is open to the further objection that it assumes that the Harbor Engineer in making his decision encountered "opposition or interference on the part of other persons." The objection most earnestly urged by the defendant to the Court's instruction is that it nowhere instructed the jury that they should allow the defendant $25.00 per day for the number of working days the plaintiffs were engaged in completing the work in excess of the 150 days allowed by

the contract. It is true, that instruction was asked for in the defendant's third prayer, and without it the jury may have supposed that the allowance of liquidated damages was left to their discretion. But the Court is not bound to prepare instructions of its own, and if it does do so, and its instruction is otherwise free from error, it can not be objected to on the ground that it fails to include instructions asked for in prayers that were properly rejected. We see no objection to defendant's second prayer, and as it was not covered by the Court's instructions there was error in the refusal of the Court to grant it. The exception to the granting of the plaintiffs' ninth prayer is not pressed in the brief of counsel for the appellant, but as the case will be remanded we call attention to the fact that the specifications provide that the final payment shall be made forty days after the completion and *acceptance* of the work by the Engineer.

In the first, second, sixteenth, seventeenth and eighteenth exceptions the witnesses were asked to state conversations they had with the Harbor Engineer. The evidence elicited by these questions was admissible as tending to show the opinion of the Engineer as to the fact, extent and causes of the delays claimed by the plaintiffs, and as reflecting upon the question whether his estimate of the number of working days the plaintiffs were engaged in the work was *his* decision of the matter.

The evidence referred to in the third, fourth and fifth exceptions was offered by the defendant for the purpose of showing that the plaintiffs' bid amounted to $87,810.08 and that the bid of another bidder amounted to $84,856.95; that the plaintiffs offered to do the work in 150 working days, and the other bidder offered to do it in 270 working days, and that in consideration of the fact that the time stated in the bid of the plaintiffs was much shorter than that mentioned in the other bid the contract was awarded to the plaintiffs. This evidence was admissible for the purpose of showing that the provision in the specifications for the payment of $25.00 per day should be construed as a stipulation

for liquidated damages, and not as a penalty. In the case of
*United Surety Co.* v. *Summers, supra,* this Court quotes with
approval the statement in *United States* v. *Bethlehem Steel
Co.,* 205 U. S. 105, that "acceptance of the bid for the shorter
time is evidence that the element of time is of essence,
and a stipulated deduction of an amount per day equivalent
to the difference between the long and short time for delivery
is to be construed as liquidated damages, and not as a pen-
alty, though the word penalty may have been used in some
portions of the contract." There was also error in the refusal
of the Court to strike out the answer of the witness in the
sixth exception. It was not responsive to the question, and
the evidence was not admissible for the purpose of varying
the terms of the written contract.

What Mr. Ault said to Mr. Scarlett was not admissible,
and the evidence objected to in the seventh exception should
have been excluded, but we see no objection to the statement
of Mr. Scarlett to Mr. Ault referred to in the eighth excep-
tion, as it tended to show that the work was delayed by the
Scarlett buildings. The same may be said of the evidence
admitted in the ninth and tenth exceptions. It was admis-
sible for the purpose of showing that the plaintiffs could not
use the most effective machinery by reason of the proximity
of the Scarlett building. The weight of this evidence was,
of course, a matter for the jury. The evidence admitted in
the eleventh, twelfth and thirteenth exceptions should have
been excluded. The specifications expressly stated that "no
piling or other obstructions will be permitted in the bed of
Jones' Falls," and evidence that the plaintiffs were delayed
because they were not allowed to put "false work" in the
bed of the Falls was not admissible. The particular ques-
tion objected to in the fourteenth exception is not shown to
have been answered, but the statement of the witness in an-
swer to a further question, that "they would not let us set up
the stiff-leg derrick" appears to be hearsay evidence. The
witness should not have been allowed to answer the question

objected to in the fifteenth exception. What Mr. Ault said to him was not admissible against the City. The defendant was not injured by the refusal of the Court to allow the witness to answer the question objected to in the nineteenth exception. He had just stated that the Gas Company employed a large force in moving the gas mains, and that "they did not lose a day from the beginning to the end," which was equivalent to saying that the work done by the Gas Company "proceeded promptly and with reasonable diligence." Nor was the defendant prejudiced by the ruling in the twentieth exception. The Court excluded from the consideration of the jury the claims of the plaintiffs for extra work, and what a member of the Harbor Board said to the Harbor Engineer in regard to those claims, even assuming that it was admissible as reflecting upon the Engineer's good faith in rejecting them, which we do not decide, it had no bearing upon the questions relating to delay, which were practically the only ones submitted to the jury.

It follows from what we have said that, because of the errors pointed out in the ruling of the Court on the prayers and the instruction given the jury, and in the third, fourth, fifth, sixth, seventh, eleventh, twelfth, thirteenth and fifteenth exceptions, the judgment must be reversed and case remanded for a new trial.

*Judgment reversed, with costs to the appellant, and a new trial awarded.*